ODOM, Justice.
 

 On March 3, 1894, J. Sully Martel acquired from Mrs. Emma Fuselier Brown-son, by act of dation en paiement for professional services rendered, an undivided one-half interest in the following described property in the Parish of St. Mary:
 

 “That portion of Lot 5 of Section 30, or the Southeast Quarter of said Section, in Township 13 South, Range 10 East, lying North of Bayou Grue, containing 95 acres; and Lot 1 of fractional Section 29 in Township 13 South, Range 10 East, containing 32.05 acres.”
 

 
 *706
 
 Martel was then married, and the property fell into the community which existed between him and his wife. Mrs. Marguerite Brownson Martel, wife of J. Sully Martel, died intestate on December 13, 1899, leaving 10 children, issue of her marriage with J. Sully Martel, all then minors.
 

 On March 3, 1900, about two and one-half months after the death of his wife, j. Sully Martel sold to F. C. Viguerie the one-half interest which he had acquired in Lot 5 of Section 30, the deed making no mention of Lot 1 of Section 29. This deed from Martel to Viguerie included the one-fourth community interest of Martel’s deceased wife, which interest had been inherited by her children. Martel seems to have overlooked the fact that his children owned by inheritance from their deceased mother an undivided one-fourth interest in the land.
 

 On October 3, 1929, the heirs of F. C. Viguerie sold to A. B. Hunt the one-half interest in Lot 5 which Martel had sold to their ancestor on March 3, 1900. Hunt now claims to be the owner of an undivided one-half interest in the land, and prior to the filing of the present suit he executed a mineral lease on the land in favor of the Texas Company. The owners of the other half interest in the land involved in this suit granted a mineral lease thereon to the Pan-American Production Corporation, which corporation, under a joint working and developing agreement with the Texas Company, explored the property for oil and brought in a producing well, which has produced large quantities of oil since its completion in September, 1937.
 

 Plaintiffs are the heirs, the children and grandchildren, of Mrs. Marguerite Brown-son Martel, the deceased wife of J. Sully Martel. They alleged that the sale of an undivided one-half, interest in Lot S of Section 30, made by their father and grandfather to F. C. Viguerie on March 3, 1900, was an absolute nullity in so far as the one-half community interest of their mother was concerned, and that the sale by the Viguerie heirs to A. B. Hunt on October 3, 1929, was likewise null and void in so far as this community interest was concerned. Plaintiffs alleged that they now own an undivided one-fourth interest in the property, this being an undivided one-half of the undivided one-half therein acquired by their father during the lifetime of their mother. They further allege on belief that an accounting would show that the value of their one-fourth of the oil produced by the well exceeds $20,000.
 

 A. B. Hunt, the Viguerie heirs, and the two oil companies were made defendants. Plaintiffs prayed for judgment recognizing them to be the owners of an undivided one-fourth interest in the land and cancelling the mineral lease executed by Hunt to the Texas Company in so far as it affected their one-fourth interest, and for judgment in solido against the oil companies for the value of one-fourth of the oil produced and saved.
 

 The defendants filed answers in which they admitted the transfer of an undivided one-half interest in the land to J. Sully Martel byMrs. Emma Fuselier Brownson, but refused to admit or deny plaintiffs’ allegations as to the extent of the interest
 
 *708
 
 in the land owned by Mrs. Martel, plaintiffs’ mother and grandmother, at the time of her death, or the extent of the interest in the property inherited by plaintiffs. The Texas Company and Hunt alleged that Hunt had good and perfect title to the land by virtue of the record transaction referred to. In addition, they alleged that the land was acquired in good faith by deed translative of property, and that defendants had for more than 10 years possessed it corporeally in good faith. Based on these allegations, they especially pleaded the prescription of 10 years acquirendi causa, under Article 3478 of the Revised Civil Code.
 

 The Texas Company alleged in the alternative that, if it should be held that plaintiffs owned an undivided one-fourth interest in the land, it should be allowed to deduct from the value of the oil produced the costs of drilling and' Other operations, in which event it would owe plaintiffs nothing because the costs of production have exceeded the value of ■ the oil produced and saved. The Texas Company asserted also certain warranty claims against its lessors, Mr. and Mrs. Hunt.
 

 There was judgment in favor of the plaintiffs, recognizing them to be the owners of an undivided one-fourth interest in the land and the same interest in the oil extracted therefrom, the latter claim being allowed on condition that plaintiffs reimburse the Texas Company one-fourth of its expenses incurred in drilling the well and producing the oil. As to the call in . warranty of the Texas Company against Hunt and'his wife, there was judgment in its favor for one-half the cash bonuses paid them for the leases and one-half the royalties paid them out of the oil produced, this for the reason that the leases made by Hunt and his wife were held valid only as to an undivided one-fourth instead of the one-half interest in the land as called for by the leases. The Hunts were ordered to pay such proportion of the court costs as the Texas Company might ultimately have to pay. The demand in warranty by the Texas Company against the Hunts for one-fourth of the cost of drilling and production was rejected.
 

 Hunt, his wife, and the Texas Company appealed from the judgment in favor of the plaintiffs on the main demand. The Texas Company appealed also from that part of the judgment which rejected its demands in warranty against Hunt and his wife for one-fourth of the costs of the drilling and the production of the oil.
 

 The testimony adduced at the trial shows — and the defendants now admit— that the one-half interest in this land purchased by J. Sully Martel from Mrs. Emma Fuselier Brownson, on March 3, 1894, fell into the community of acquets and gains which existed between him and his wife, Mrs. Marguerite Brownson Martel, and that at her death her community interest was inherited by her 10 children, then all minors. The testimony shows further — and this also is admitted by defendants — that these children never alienated their interest in the. land; so that they or their heirs now own the one-fourth interest they claim unless their interest has been acquired by defendants by the
 
 *710
 
 prescription of 10 years acquirendi causa, under Article 3478 of the Revised Civil Code. Counsel for defendants say in their brief:
 

 “It devolves upon defendants, therefore, to show that the
 
 y^th
 
 interest of plaintiffs in the property was later divested by the prescription of ten years acquirendi causa which has been specially pleaded by them.”
 

 Viguerie acquired no valid title to this one-fourth interest from Martel because Martel had none, and for the same reason Hunt acquired no title from the heirs of Viguerie unless the Vigueries had prescribed for it in 10 years.
 

 Conceding that Frank C. Viguerie acquired the property in good faith from Martel on March 3, 1900, by deed translative of property, and that Viguerie or his heirs held it in good faith until the heirs sold it to A. B. Hunt in October, 1929, and that Hunt likewise purchased in good faith by valid deed and has ever since held it in good faith, the question then is whether or not the Vigueries and Hunt have had that character of possession which entitled them to prescribe for it in 10 years.
 

 Article 3487 of the Code, speaking of the kind of possession required to enable one to plead the prescription treated in this paragraph, provides that the possessor shall have held the thing in fact and in right and as owner for the time specified, and that the possession shall have been continuous, uninterrupted, peaceable, public, and unequivocal.
 

 The land involved in this suit is Lot 5, or the fractional southeast quarter, of Section 30, which is all of' the land in the southeast quarter of that section north of Bayou Grue, which bayou runs in a general east and west direction and empties into Grand Lake. Lot 1 of Section 29, which is mentioned in the pleadings as well as in the testimony, lies east of, and adjacent to, Lot S, and borders on Grand Lake. Lot 5 is bounded on the south by Bayou Grue, but it does not extend to Grand Lake. The land is wild, is in a low swamp, and is subject to overflow. No part of it is susceptible of cultivation. It has never been fenced and was never used as pasture land. While there is some rather vague and indefinite testimony in the record that the boundaries of Lot 5 are marked by hacks or blazes on trees, there is no testimony that the land was ever actually surveyed, nor is it shown when or by whom the trees were marked. There is some testimony that the southeast corner of Section 30 has been established and is now marked. The only structure ever erected on the land was a small squatter’s shack , known as Pete Randolph’s camp, which we shall mention later in this opinion. The land is practically worthless for any purpose except the production of minerals. No one has ever paid taxes on it. It has never been assessed. Frank C. Viguerie, who purchased the land from J. Sully Martel in 1900, died in 1919, and his heirs were recognized and sent into possession of several tracts of real estate belonging to his succession. But this tract was not
 
 *712
 
 listed, which indicates at least that the heirs thought nothing of it at that time.
 

 In order to make out their title by prescription, defendants have attempted to show that F. C. Viguerie took possession of the land a short time after his purchase from Martel in 1900. The only character of possession which they claim he had at that time, or which anyone ever had, was the possession incidental to the cutting and removal of trees from the land.
 

 Defendants called a colored man named Monroe, who testified that about 1903 or 1904 he, his father, and his brothers were employed by F. C. Viguerie to cut and float some timber from the land. Other witnesses recalled that the Monroes had deadened and removed some timber about that time.
 

 But this testimony introduced to show that Viguerie took physical possession in 1903 or 1904 of Lot 5 of Section 30, the land in controversy, must be disregarded for this reason: Walter J. Suthon owned an undivided one-half interest in the tract, and Viguerie claimed to own the other half interest. Suthon sued Viguerie for a partition in kind. Viguerie set up the plea that he had acquired the half interest claimed by Suthon by the prescription of 10 years acquirendi causa. The case was brought to this court and decided in favor of Suthon on December 12, 1910. Suthon v. Viguerie, 127 La. 538, 53 So. 855. The character of possession which Viguerie claimed in support of his plea of prescription was the same as that claimed by defendants in the present suit to support the same plea, i. e., the cutting and removal of trees from the land. Mr. Viguerie there testified positively that he removed no timber from Lot 5 of Section 30 but that the timber he removed was from Lot 1 of Section 29, which lot is not involved in the present litigation. The record of the testimony which he gave in that suit was filed in evidence in the present suit; so that it is not true, as defendants now claim, that Viguerie took corporeal possession of Lot 5 back in 1903, and therefore a great deal of the testimony found in the record in this case must be disregarded.
 

 Defendants offered no testimony tending to show possession of any character from 1903 or 1904 to 1913. They called several witnesses who testified that in the year 1913 or 1914 Frank C. Viguerie sold timber to the Spiller Lumber Company on what is frequently referred to by the witnesses as the “undivided tract”, which we understand is composed of Lot 5 of Section 30 and Lot 1 of Section 29. The testimony shows that Spiller & Company removed a considerable quantity of timber from that immediate section of the swamp, that the timber was removed by the use of what the witnesses called a “pullboat” anchored out in Grand Lake, and that the timber was pulled in from the forest by a contrivance which the witnesses referred to as a “skidder pull”, or draglines, of sufficient length to extend out into the forest a distance of 2,500 feet, more or less, which distance included the distance between the pullboat and the shore, which was about 100 yards. The pullboat was anchored in Grand Lake opposite Lot 1
 
 *714
 
 of Section 29, and such timber as was removed had to be pulled by means of these draglines across Lot 1.
 

 Defendants tried to show that some of the timber removed by Spiller & Company was floated out to the lake through Bayou Grue, but their attempt to prove this failed. Defendants tried to show also that Spiller & Company by use of the draglines removed trees from Lot 5, and, while there is testimony which indicates that that is true, yet the testimony to that effect is not at all definite. To say the least, there is no testimony in the record which shows with any degree of certainty that Spiller removed any trees at all from Lot 5. The testimony does show that the timber was removed from land north of Bayou Grue, but Lot 1 of Section 29, as well as Lot 5 of Section 30, is north of Bayou Grue. The witnesses said they did not know definitely where the timber came from, except that it was pulled from north of Bayou Grue.
 

 There is no testimony even indicating that those in charge of the pullboat and the skidder pull or the laborers knew where the land-lines were. The testimony does not show that the particular tracts from which the timber was to be removed were pointed out to them. ,The testimony relied on by defendants to show that timber was actually removed from Lot 5 by Spiller & Company is so vague and indefinite' that it cannot be held that F. C. Viguerie had corporeal possession of Lot 5 in 1913 and 1914. The district judge so held, and we have most carefully checked the record and find that he was not mistaken. As to whether the timber operations of 1913-1914 were sufficient to show corporeal possession, the trial judge said in his written opinion:
 

 “This solitary act is manifestly insufficient, when considering surrounding circumstances, to establish that nature of possession our law requires .as a basis for prescription.
 

 “In connection therewith it must be borne in mind that defendants in their an-, swers concede that Viguerie claimed an undivided half interest and Suthon the remainder. It is shown that Viguerie received the payment for the timber removed with no evidence to show what disposition was made thereof insofar as co-owners were concerned. It is likewise shown that the pull-boat operations were conducted principally on Lot 1 of Section 29, its lines barely encroaching into Lot 5. It is likewise shown that during the entire operations Viguerie at no time visited the scene with the exception of one day when he called to determine whether or not timber was being pulled from his or someone else’s land. Those in charge of said operations had not been pointed out the property lines, had not seen any evidence thereof, were without knowledge as to whom the property belonged, never having heard of Viguerie claiming the same, their operations extending over a few months each year of 1913 and 1914 and thereafter abandoned.”
 

 For a period of 20 years after 1913, there were no timber operations on the land. Apparently the land was abandoned during that entire period.' The testimony shows that in 1933 timber worth about $100 was
 
 *716
 
 sold off the property to J. J. Millet by persons who owned interest in the land, and that the timber sold was cut principally from Lot 5 of Section 30. The testimony as to the removal of the timber in 1933 is the only testimony in the record which shows with any degree of certainty that any timber was ever removed from Lot 5. But the possession of the land evidenced by these timber operations in 1933 is not of itself sufficient to support defendants’ plea of prescription because these operations took place less than 10 years prior to the date the suit was filed, which was in December, 1937.
 

 The only other act of possession relied upon by defendants is the building
 
 of
 
 what is referred to as Pete Randolph’s camp on Lot 5. It is defendants’ contention that this so-called camp, or shack, was built upon the land by Pete Randolph more than 10 years prior to the date on which this suit was filed. The trial judge disposed of this phase of the case by saying:
 

 “Defendants contend that in the latter part of the year 1927 a camp was' constructed on Lot 5 through a permit granted by one Henry Ecuert to one Pete Randolph, in consideration of which the latter would act as a guardian and caretaker of said property. The dates when the permit is stated to have been granted and the date of the actual construction of said camp is clearly a matter of conjecture. We have the testimony of three or four witnesses who fixed the construction of said camp immediately following the high-water period of 1927. We have the testimony of five or six witnesses who contradictorily fixed the construction of said camp in the year 1933 or 1934. The testimony of Randolph is first to the effect that he obtained a permit and constructed the camp in August, 1927. The testimony of Henry Ecuert who acquired his undivided interest, as aforestated, in October, 1927, is to the effect that the camp might have been constructed within five or six months after the date of his acquisition. Undoubtedly to meet the self-evident fact that Randolph’s permit from Ecuert could not precede the latter’s acquisition, on being recalled, Randolph fixed the date not as of August but November, 1927. On being recalled, his testimony is filled with so many contradictory statements that little weight can be attached to his credibility. The effort to fix the construction of this camp in October or November of 1927 is clearly to meet the date of the filing of the suit, that is December 27, 1937, on the basis of the ten year prescriptive plea.
 

 “Whatever the date of the construction of the camp, such an act was not one of possession. Randolph is shown to be one who has exercised the self-determined rights of a squatter for the past 25 years, living on property of others without authority and even without the knowledge of the owner. His life’s work has been that of a nomadic fisherman and hunter. The construction of this camp in which he claims to have placed his demented mother and brother, he having a squatter’s camp on the south side of Bayou Grue in which he lived without the consent of the owner, can be clearly defined as that of the perennial squatter. He had no knowledge of any property lines, if any then existed, no knowledge of the ownership or its extent,
 
 *718
 
 exercised no rights of any authority towards trespassers or other squatters, his conduct toward said land being simply that of indifference. This lack of authority and attitude of indifference is shown by his conduct to one Landry who occupied a camp on said property during 1933 and ’34 as a squatter. It is shown that Randolph then declared that it was a matter of indifference to him as to who squatted on the property.
 

 “Hence, it is, that the mere construction of such a camp, at a date, to say the least, speculative, under the circumstances attending the same, can lend , little support to a possession as contemplated by law in support of a title founded on prescription.”
 

 Our reading of the record has convinced us that the trial judge did not err in his finding as to the facts connected with the construction of this so-called camp.
 

 This court has repeatedly held that .the cutting and removing of timber from wild, swamp land is sufficient evidence of that corporeal possession which is necessary to support the prescription of 10 years. But a reading of the cases which so hold will show that something more is necessary to be done in connection with the removal of the timber than was done in this case, even if it be conceded that some timber was removed from this land. It is gen-' erally held that the occasional cutting of trees for lumber, cordwood, crossties, and firewood is not sufficient. In Frederick v. Goodbee, 120 La. 783, 45 So. 606, 608, this court said: “The law contemplates that the corporeal possession of the thing should be accompanied by external and public signs, announcing the possessor’s intention to preserve the possession of the thing, as the keeping up of roads and levees, the payment o'f taxes, the erection of works, and other similar acts.”
 

 In short, the rule is that there must be such external signs of possession as to indicate clearly that the possessor holds control and dominion over the property. No such external signs of possession and dominion were proved in this case. It is not pretended that timber was cut from all parts of this tract of land; no roads or levees were built; no works of any kind were erected; no tram road was built; there is. no evidence that either Viguerie or any of the coowners had the land surveyed; no markers were erected to show the boundaries of the land; no taxes were ever paid on the property. The pullboat used in 1913 to skid the trees from the forest was anchored out in Grand Lake a considerable distance from the land. ■ ■ .
 

 Reviewing the leading cases relating-to the question of possession of swamp or overflowed, land cited by counsel , for de- - fendants, we find that the evidence held to-, be sufficient to show possession-necessary to support the plea of prescription is- altogether different in character from .that; shown . in this case. In Chamberlain v. Abadie, 48 La.Ann. 587, 19 So. 574, 575, this court said: • “The corporeal possession necessary to support the prescription is governed by the use for which the land is destined. If it is for pasturage, the grazing of cattle upon it is an act of corporeal possession. . From its nature, it. may forbid an actual residence or cultivation.
 
 *720
 
 Timbered land may be inclosed, trees cut, roads run through it, and many other similar acts to show the intention to subject it to one’s dominion.”
 

 In the early case of Baker v. Towles’ Adm’x, 11 La. 432, the testimony showed that Towles cut wood and timber on the land habitually, and at one time had a small enclosure which was used as a garden. In Miller v. Albert Hanson Lumber Co., 134 La. 225, 63 So. 883, the acts of possession which the court considered sufficient were that Miller, after his purchase of the land, had the same surveyed and the boundary lines marked, and for a continuous period of seven years cut and used trees on the tract for building purposes; that he paid the taxes on the property continuously through a period of 21 years; that at his death the property was inventoried as a part of his succession, and that prior to his death he had made a contract for the sale of the cypress timber on the tract.
 

 In Industrial Lumber Co. v. Farque, 162 La. 793, 111 So. 166, 167, the testimony showed that, a short time after plaintiff purchased' the property, it entered upon and took physical possession of it, “had the land surveyed, had levels run thereon, placed marking stakes on all four sides of the property, 200 feet apart, built a tram railroad across it, and continued active operations thereon for about four months, during which time' it cut and removed from the land approximately 250,000 feet of merchantable timber, which was all the timber of value thereon”.
 

 The testimony in that case showed that, after all of the timber of value was removed from the land, “plaintiff employed a man to look after this and other lands in the vicinity belonging to it, and has had an employee serving in that capacity continuously since that date. In addition to these acts of ownership and possession, plaintiff sold a canal right of way across the land, and has executed leases thereon for oil development purposes. Since the date of the deed from White to plaintiff the land has been assessed to and plaintiff has paid the taxes thereon”.
 

 In the recent case of Kees v. Louisiana Central Lumber Co., 183 La. 111, 162 So. 817, the possession relied upon and held, sufficient to support the plea of prescription was that a tram railway had been built on the land and all of the merchantable pine timber, removed therefrom over a period of three months, and the railroad track remained on the land and was used for hauling other timber for a period of a year.
 

 The testimony in the case at bar fails to show that defendants and their authors in title ever had possession of the land sufficient to support their plea of prescription. Plaintiffs are therefore the owners of an undivided one-fourth interest in the land and are entitled to recover the value of one-fourth of the oil produced and saved up to the time the suit was filed, and are entitled to an accounting.
 

 The next question presented is whether plaintiffs must contribute one-fourth of the cost of drilling the well and. the same proportion of the cost of production of the oil. Counsel for plaintiffs argue that the Texas Company, which se
 
 *722
 
 cured its lease from the Hunts, was in bad faith. We do not think so. Before drilling operations were begun, it had an abstract of title made and approved by attorneys of recognized ability and experience. Counsel for plaintiffs say in their brief that Mr. Stewart, division manager for the Texas Company, admitted that on August 2, 1937, three days after drilling operations were begun, the company learned that Mrs. Martel died before the purported sale by her husband, leaving children. The information conveyed to Mr. Stewart was by letter, which is attached to Mr. Stewart’s depositions. The letter does not state that Mrs. Martel died before the sale was made by her surviving husband to F. C. Viguerie, but merely states that she died “on Dec. 31st, 1899 and the deed from Martel is close to this date”. But this information alone, conveyed as it was to a person not connected with the company’s legal department, would not necessarily create the impression that the title was bad. Mrs. Martel died 40 years before the drilling com- ' menced, and Mr. Stewart may have assumed that during that long period the Vigueries had acquired valid title in some way recognized by law, even though there had been some irregularity in the sale made by Martel, or he may have assumed that this fact was taken into consideration ■'by the attorneys who approved the title.
 

 i The testimony shows, in our opinion, that the Texas Company acted in legal, as well as actual, good faith. Therefore, since the. plaintiffs are claiming ownership of one- •; fourth of the oil produced by the well and .have prayed for judgment against the defendant oil companies for its market value, they must pay their pro rata share of the expense of producing it. This view is supported by the following cases: Mason v. United States, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396; Cooke v. Gulf Refining Co., 135 La. 609, 65 So. 758; Allen v. Frank Janes Co., 142 La. 1056, 78 So. 115; State v. F. B. Williams Cypress Co., 131 La. 62, 58 So. 1033; State v. Rathbone, 144 La. 835, 81 So. 334.
 

 When the oil reached the surface of the ground, one-fourth of it belonged to plaintiffs as the owners of an undivided one-fourth interest in the soil. They alleged in their petition, and have claimed all along, that one-fourth of the oil belonged to them, and are asking judgment for its market value. Article 501 of the Revised Civil Code provides that “The fruits produced by the thing belong to its owner, although they may have been produced by the work-and labor of the third person, or from seeds sown by him, on the owner’s reimbursing such person his expenses”. In Mason v. United States, supra, the Supreme Court of the United States held that this article of the Code is applicable to cases where oil is extracted from the land of another, citing Cooke v. Gulf Refining Co., supra.
 

 Plaintiffs’ property was practically worthless until it was developed for oil by the defendant companies. That is admitted. Through the efforts and at the expense of the defendants, plaintiffs’ land has been made to produce oil, or “fruits”. Hence plaintiffs have been greatly benefited by the venture of the defendant companies. But, under the above quoted ar
 
 *724
 
 tide of the Code and the decisions cited, they cannot keep the “fruits” without reimbursing the companies' their expenses. See Nabors Oil & Gas Co. v. Louisiana Oil Refining Co., 151 La. 361, 91 So. 765.
 

 The well was drilled to the total depth of 7327 feet at a cost of approximately $65,000. It produced no oil from that depth and was “plugged back” to a depth of 3949 feet, and from that depth it produced oil. It seems that the cost of drilling the well to a depth of only 3949 feet was approximately one-half the cost of drilling it to the greater depth. Plaintiffs therefore say that defendants spent twice as much for the well as was necessary, and that they should not be required to contribute more than their pro rata share of the cost of drilling to the lesser depth.
 

 There is no merit in this argument. The purpose of the oil companies in drilling was to discover and extract oil from the ground. It cannot be said that the drilling of the well to the greater depth was an act of bad faith, and we are not in position to say that the companies used poor judgment in doing so. The companies were endeavoring to make the most of their investment. They were exploring for oil, and the costs of their explorations amounted to nearly $65,000, and plaintiffs must contribute their pro rata share of this amount.
 

 The remaining question is whether the Texas Company is entitled to judgment against the Hunts, its warrantors, for one-fourth of the expenses of drilling the well. The leases .executed by Mr. and Mrs. Hunt to the Texas Company covered an undivided one-half interest in the land. The warranty clause in the leases reads as follows : “Lessor hereby warrants and agrees to defend the title to said land”.
 

 The Texas Company alleged in the alternative that, in case it, should be held that plaintiffs owned an undivided one-fourth interest in the land, then it should have judgment against the Hunts for one-half the cash bonus paid them for the leases, one-half the value of the royalties paid them, one-fourth the cost of drilling the well, and that the Hunts should be ordered to pay such proportion of the court costs as the company might ultimately have to pay.
 

 There was judgment in favor of the Texas Company against the Hunts for each of these items except that for the expense of drilling the well, which item was rejected, and the Texas Company appealed.
 

 The lease contract entered into by A. B. Hunt and the Texas Company is designated on its face as an “Oil and Gas Mining Lease”, in which Hunt is referred to as "lessor” and the company as “lessee”. It later developed that his wife owned an interest in this half interest in the land, and she executed a lease in favor of the Texas Company identical with that made by her husband covering her interest in the land, the two leases covering a one-half interest in the land. These leases recite that the lessor, in consideration of a certain sum paid in cash and of the royalties reserved, “grants, leases and lets exclusively unto lessee, for the purpose of testing by any method for formations or structures and prospecting and drilling for and pro
 
 *726
 
 ducing oil and gas, laying pipe lines, building tanks, storing oil and building powers, stations, telephone lines and other structures (including houses for employees) thereon, to produce, save, take care of, treat and transport said products”.
 

 The lease also contains the following clause:
 

 “Subject to the other provisions herein contained, this lease shall remain in force for a term of ten years from this date (hereinafter called 'primary term’) and as long thereafter as either oil or gas is or can be produced from any well on said land; however, lessee at any time may release this lease in whole or in part.”
 

 The lease contains the following clause also:
 

 “Lessee shall have the right at any time during or after the expiration of this lease to remove all property-and fixtures placed by lessee on said land, including the right to’draw and remove all casing.”
 

 The royalties reserved by the lessors were one-eighth of the oil produced and saved, and the market value of one-eighth of the gas. What the contract means, in sum, is that the land owners granted to the Texas Company the privilege of going upon the land and “prospecting” and drilling it for the production of minerals and saving what might be found. In case of production, the land owners were to have one-eighth and the company seven-eighths of what was discovered and reduced to possession. The oil company was granted the privilege of making a venture, of prospecting or exploring the land for the discovery of such minerals as might perchance be hidden therein. The contract clearly implies that tbe Texas Company desired and intended to make a venture, to prospect or explore for something which might be of value, and that the expense of making the venture was to be borne by it; that it expected to hazard something on a chance; that it expected to risk the expense of the venture in the hope that it might gain more by discovery.
 

 This being undeveloped or wildcat territory, such a venture was necessarily hazardous and, in a sense, a gamble. But the risk was assumed by the oil company. It took.all the chances. The Hunts took none at all. For a cash bonus they granted to the oil company the privilege of exploring their land for minerals, and, in case such were discovered, their-gain was slight compared with the gain of the oil company. They were to get one-eighth’ and the company seven-eighths of what was reduced to possession and ownership. The rea’spn for this difference in profit, of course, was that the company was to.pay all the expense of drilling, take all the risk, while the land owners were to pay out nothing and risk nothing. The larger proportion of the minerals produced and saved was to go to the lessee to recompense it for the risk assumed. The lessee did not bind itself to drill. By the terms of the contract it acquired the privilege of drilling, but it was under no obligation to do so. It had 10 years' within which to make the venture and Was not obligated to pay delay rentals. In case it erected works of any character or description on the land during its' operations, it had the privilege of removing them, and,
 
 *728
 
 in case a well was drilled without success, it had the right “to draw and remove all casing”.
 

 There is nothing in the contract or in the testimony to indicate, much less to show, that the oil company relied upon the land owners’ warranty of the title. To the contrary, it appears that the oil company relied upon the advice of its own counsel as to the validity of the title. The record discloses that the company had its own legal department make an abstract of title and render an opinion as to its validity. Before the contract was entered into, the company’s attorneys approved the title. There is nothing in the record to indicate that the lessors had the title investigated or that they made any representation whatever as to its validity except the warranty clause found in the lease contract. There is nothing whatever to indicate that the oil company proceeded upon the assumption that, if the lessors’ title failed, the lessors would reimburse it for its- expenses in making the explorations.
 

 The tenor of the contract as a whole negatives the idea that the contracting parties contemplated that the lessors should be held responsible for the expense of exploring the land for minerals in case the title proved defective.
 

 But, by warranting the title to the land leased, the land owners obligated themselves “To cause the lessee to be in a peaceable possession of the thing [the land] during the continuance of the lease” (Paragraph 3, Article 2692, Revised Civil Code).
 

 The result of our holding that plaintiffs are the owners of an undivided one-fourth interest in the land and of our judgment sending them into possession is that the lessee is evicted and the lease is interrupted in so far as that one-fourth interest is concerned. The lessors have therefore defaulted on their obligation to maintain the lessee in peaceable possession of the land, the thing leased. As a consequence, the lessors must respond in damages under Article . 2696 of the Code, which is found in that chapter of the Code which treats of the letting out and hiring of things. That article of the Code reads as follows:
 

 “If the lessee be evicted, the lessor is answerable for the damage and loss which he sustained by the interruption of the lease.”
 

 The question then is whether, under the circumstances here shown to exist, the expense of drilling the land should be included as an item of “damage and loss” for which the lessors are answerable.
 

 The articles of the Code found under the title “Of Letting Out Things” in Chapter 2, title 9, and especially in Section 2 thereof under the subtitle “Of The Obligations And Rights Of The Lessor”, do not specifically mention the measure of damage or the items of loss for which the lessor is answerable in case of eviction and interruption of the lease. We must therefore look to the other articles of the Code which relate generally to the obligations of warrantors in case of eviction. It was so held in the case of Knapp v. Guerin, 144 La. 754, 81 So. 302.
 

 Article 1930 of the Code, which is found under the title “Of The Effect Of Obligations”, subtitle “Of The Damages Result
 
 *730
 
 ing From The Inexecution Of Obligations”, reads as follows:
 

 “Damages for Violation of Contract.
 
 The obligations of contract extending to whatsoever is incident to such contracts, the party who violates them, is liable, as one of the incidents of his obligations, to the payment of the damages, which- the other party has sustained by his default.”
 

 x Article 1934, found under the same general heading, relates to the measure of damage due to the creditor for the breach of a contract. That article provides:
 

 “1934.
 
 Damages; Measure.
 
 Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit or which he has been deprived, under the following exceptions and modifications:
 

 “1.
 
 Only Contemplated Damages, Where ■no Fraud or Bad Faith.
 
 When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the cop-tract. By
 
 bad faith
 
 in this and the next rule, is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.”
 

 The object of the contract in this case was something other than the payment of money. The Hunts perpetrated no fraud and were guilty of no bad faith in the execution of the lease, so that the damages for which they are answerable are such as were contemplated, “or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract”.
 

 In the case of Knapp v. Guerin, supra, the plaintiff was lessee of the two upper floors of a three-story building, which was condemned under the police power of the city on account of its defective condition. Plaintiff had a long lease on the premises and had expended a considerable sum in making improvements which were to revert to the lessor at the termination of the lease. He had expended an additional sum for fixtures. The building was condemned and destroyed about 31 months before the expiration of the lease. Plaintiff had subleased a portion of the building. The destruction of the building was by order of the municipal authorities, but the court said that the real cause for its destruction was its defective condition due either to faulty construction or decay or lack of repairs, for which the lessor was responsible.
 

 Plaintiff sued for damages caused by the interruption of the lease, and as items of damage he claimed reimbursement for the cost of improvements, cost of moving to another location, loss of time from business, and loss on subleases.
 

 He based his claim for damages on the law laid down in Articles 2695 and 2696 of the Code. Article 2695 says that the lessor guarantees the lessee “against all the vices and defects of the thing, which may prevent its being used even in case it should appear he knew nothing of the existence of such vices and defects, at the time the lease was made”; and Article 2696 provides
 
 *732
 
 that, if the lessee be evicted, “the lessor is answerable for the damage and loss which he sustained by the interruption of the lease”.
 

 Before discussing the items of plaintiff’s damage and loss, the court said [144 La. 754, 81 So. 305]:
 

 “Defendant is liable for such damages as entered reasonably into the contemplation of the parties at the time of making the lease (R.C.1933), unless there be some other provision of law which prohibits such recovery.”
 

 Later on in its opinion the court said: “We think it reasonable to say that inasmuch as the lessor did not desire to go to any extra expense in fitting up the premises for the purpose for which plaintiff intended to use them, the latter agreed to take them as they were, and to make his own changes and improvements, and that the parties did not have in mind any defects such as were subsequently discovered and caused the destruction of the building. A similar provision was so construed in the case of Pierce v. Hedden, 105 La. 294, 29 So. 734.”
 

 As to the item of loss on subleases, the court said:
 

 “The article of the Code, 2696, above quoted, provides that the lessee may recover the loss which he has sustained by the interruption of the lease, but must be construed together with the article 1933, governing the breach of contracts in general. We think it must have reasonably entered into the contemplation of the parties . that plaintiff would be injured by his inability to sublease the premises, as was specially provided in the contract.”
 

 The Knapp. v. Guerin case holds definitely that Article 2696 of the Code, which provides that in case of eviction the lessor is answerable in damages, must be construed with those articles of the Code relating generally to damages which may be claimed for the violation of contracts, and holds also that lessors are answerable for such damages as were contemplated or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract.
 

 The question, then, is whether the parties to the contract presently under consideration contemplated, at the time it was entered into, that the lessors should pay the expenses of drilling a well in the event of an interruption of the lease on account of defects in the title of which neither party was aware at the time the contract was made.
 

 There is nothing in the contract itself and nothing in the testimony to indicate that either party contemplated that the lessors were to be answerable for such damage in case of eviction. The very nature of the contract entered into, the motives and purposes which prompted the parties to make it, we think, unmistakably refute the idea that such was contemplated by either. The lessors owned, or thought they did, a small tract of land which was of no value to them as far as the surface rights were concerned. There was a possibility, of course, that there was oil beneath the surface, but the land was not in proven territory. Lessors were not in the oil production business.
 
 *734
 
 The lessee was in that business and had the capital which it was willing to risk in such hazardous enterprise. The lessors for a cash consideration gave lessee a permit to explore their land. That is all they did. This lease contract contemplated, as is contemplated in all such contracts, that the lessee should pay all the expenses of explorations and drilling operations, and that the lessee assumed all risks. There is nothing in the record to indicate that the lessors knew anything about their title, but, as we have said, it is definitely shown that the lessee had the title examined and approved, as is the custom in transactions of this kind. The lessors seem to have assumed, as they had a right to do under the circumstances, that the lessee was satisfied with the title. It would be unreasonable to assume that the lessors contemplated that they would be answerable to the lessee for the expense of its explorations in case their title should be found to be defective.
 

 It is common knowledge that the expense of mining operations is enormous; and it is for that reason that land owners do not ordinarily explore their own lands for minerals but, in order to have them explored, are willing to let them out to those engaged in that business, who have capital which they are willing to risk on such ventures. It is unbelievable that any sane person would, for an insignificant cash bonus and oné-eighth of the minerals, lease his land for mining purposes if he thought by so doing he was assuming an obligation which might result in worse than bankruptcy to himself or his heirs in 'Case his title should fail.
 

 And it is unreasonable to assume that the lessee in this case risked the heavy expense of drilling this well on the lessors’ bare warranty of title. No concern managed by experienced business men would do that. So far as this record discloses, there was practically nothing behind the lessors’ warranty. All the lessors seemed to have owned was a small tract of almost worthless land, so that their warranty amounted to almost nothing as compared with the expense of drilling. Surely the Texas Company did not stake its investment on the faith of the warranty.
 

 Our conclusion therefore is that, under the circumstances, the Hunts are not answerable for the drilling expenses.
 

 In the case of Slack et al. v. Riggs et al., 177 La. 222, 148. So. 32, Riggs began drilling operations under an oil and gas lease which he had obtained from the Bodcaw Lumber Company and the Louisiana & Arkansas Railway Company, and was enjoined by Slack, who claimed to be the owner of the land. While the opinion does not so state, the record in the case disclosed that the' drilling operations were begun on the right-of-way of the railway company. Riggs, the lessee, called the railroad company and the lumber company in warranty, and prayed for judgment against them in solido for the expenses which he had incurred up to the time he was enjoined by Slack. Riggs was allowed to recover.
 

 But that case is distinguishable from the one at bar for several reasons. One is that Riggs, the lessee, made no investigation of the title but relied solely on the warranty
 
 *736
 
 of the railroad company and the lumber company. The court said in that case that he had a right to rely on these warranties, and naturally so, because he had a right to assume that the railroad company would not build its track on land, the title to which was precarious. Furthermore, his assumption that two large corporations could be made to respond in damages in case of his eviction was natural. He testified that he relied solely on the lessors’ warranty.
 

 Another distinguishing feature is that it was not shown that Riggs, the lessee, paid anything for the lease, but was shown that he assumed heavy obligations, one of which was the obligation of beginning drilling operations within 45 days and to execute bond in favor of the railroad company for $15,000 to protect the road’s employees and its property from damage on account of the drilling operations. Furthermore, the major point raised and urged in the case at bar as relates to the nature and quantum of damage allowed in case of eviction, which is that the lessee is entitled to recover only such damages as were contemplated by the parties, was not raised in that case. The main defense urged by the lessors in that case was that the lessee did not irt fact have any lease contract and for that reason he assumed all the risks. We have before us the record in that case, as well as the briefs filed by counsel, which we have examined, and we find that the situation there presented was entirely different from that presented here.
 

 For the reasons assigned, the judgment appealed from is affirmed, the defendants, except the Pan-American Production Corporation, to pay all costs.
 

 O’NIELL, C. J., recused.