532 So.2d 567 (1988)
Bob F. WRIGHT
v.
STATE OIL AND GAS BOARD OF MISSISSIPPI, Shell Oil Co. and Its Subsidiary, Shell Western E & P, Inc.
No. 58659.
Supreme Court of Mississippi.
October 5, 1988.
Ernest G. Taylor, Jr., Kathryn H. Hester, Watkins, Ludlam & Stennis, Jackson, Landman Teller, Jr., Teller, Chaney & Rector, Vicksburg, for appellant.
Mike Moore, Atty. Gen. by Tim Waycaster, Sp. Asst. Atty. Gen., Scott P. Hemleben, Gerald, Brand, Watters, Cox & Hemleben, Jackson, Melinda J. Stewart, Thomas A. Minetree, New Orleans, La., John C. Wheeless, Jr., Wheeless, Beanland, Shappley & Bailess Vicksburg, for appellees.
Before ROY NOBLE LEE, C.J., and SULLIVAN and ZUCCARO, JJ.
ZUCCARO, Justice, for the Court:

STATEMENT OF THE CASE
The appellant, Bob F. Wright, petitioned the Mississippi State Oil and Gas Board on September 25, 1985, requesting that the Board determine what costs of the Shell-Cohn Unit No. 1 well, drilled in the Alcorn Field in Claiborne County, should be chargeable to Wright's non-consenting interest. Aggrieved by the Board's subsequent order (dated November 21, 1985, and filed December 18, 1985), Wright appealed to the Circuit Court of Claiborne County. The circuit court affirmed in part and modified the order of the Oil and Gas Board. From the circuit court's judgment, Wright appeals. The State Oil and Gas Board and Shell Oil Company cross-appeal from the circuit court's modification of the Board's order.

FACTS
In the summer of 1979, Shell Oil Company proposed to drill an exploratory gas well to a depth of approximately 21,000 feet on a 640-acre drilling unit in the Alcorn area of Claiborne County, Mississippi. Shell, which held mineral leases on approximately 8,400 acres in the Alcorn area, owned the *568 majority of the leasehold interests in the proposed 640-acre unit. Approximately 19 percent, or 124.019 acres, of the leasehold rights in the proposed unit belonged to appellant, Bob F. Wright. Shell subsequently attempted to "farm in" Wright's interest in the 124.019 acres or, alternatively, to have Wright join in drilling the test well and pay a proportionate share of the drilling costs, based on his percentage of ownership in the 640-acre drilling unit. However, Shell was unable to reach an agreement with Wright as to either alternative.
On September 26, 1979, Shell petitioned the Mississippi State Oil and Gas Board to force pool and integrate all interests in the proposed 640-acre drilling unit. Shell's petition stated that Shell proposed to drill a well "to a depth sufficient to penetrate and test potential gas formations found below the depth of 12,000 feet." (Emphasis added). The depth is significant because the Board's spacing rules for gas wells require 640-acre units where the well is to be drilled to a depth below 12,000 feet, and 320-acre units where the well is to be drilled to a depth at or above 12,000 feet. Mississippi State Oil and Gas Board Statewide Rules and Regulations, Rule 8. On October 17, 1979, the Board rendered an order authorizing the 640-acre drilling unit (designated as the Shell-Cohn Unit No. 1) and force pooling Wright's 19.378 percent interest in the unit.
A Shell interoffice memorandum dated January 7, 1980, obtained by Wright through the process of discovery, stated that Shell planned to drill on the unit a 21,000-foot "Knowles" well "to evaluate the multiple objectives at Alcorn Prospect." According to the memo, "[t]he principal objectives are multiple Hosston and Cotton Valley channel sands and limestone oolite bars in the Knowles." (A geological diagram from Shell showed the Hosston sands at a depth of 15,600 feet, the Cotton Valley sands at 19,300 feet, and the Knowles formation at 20,000 feet.) The memo also stated that Shell's expected profit from the Hosston and Knowles production in the Alcorn Prospect would be 93.2 million dollars, and that "[t]his test will help evaluate Shell's acreage on other closures in the northern Mississippi Salt Basin." (Emphasis added). The Shell-Cohn Unit No. 1 well was subsequently drilled on the east side of the 640-acre unit to a depth of 21,500 feet, at a total cost of $7,599,973.00. The well was found to be non-productive at depths below 12,000 feet. However, Shell encountered at 10,509 feet a zone, designated the Washita-Fredericksburg formation, which appeared to be potentially productive.
Thereafter, Shell petitioned the Board to force pool a 320-acre unit on the west half of the original 640-acre unit. Shell proposed to drill a well on this unit to test potential gas formations found at depths less than 12,000 feet below the surface. On November 19, 1980, the Board entered an order force pooling all interests in this 320-acre drilling unit, which was designated the Shell-Cohn Unit No. 2. (Wright's interest in this unit was 19.668 percent.) The Shell-Cohn Unit No. 2 well resulted in a dry hole.
On December 15, 1980, Shell requested and received authorization from the Board to test the Shell-Cohn Unit No. 1 well at the shallower zone (approximately 10,500 feet) which had previously appeared to be potentially productive. After determining from the test that there was adequate production potential in the Washita-Fredericksburg formation, at an interval of 10,509-10,519 feet, Shell petitioned the Board on December 30, 1980, to "reform" the original 640-acre unit into a 320-acre unit in order to comply with spacing rules for wells producing from a depth of less than 12,000 feet subsurface.
On January 21, 1981, the Board issued an order "reforming" the 640-acre Shell-Cohn Unit No. 1 to a 320-acre unit composed of the east portion of the original 640 acres. The 320-acre unit also was designated the Shell-Cohn Unit No. 1. The Board's order also authorized Shell to charge the force-pooled and integrated owners in the 320-acre unit their proportionate part of the cost incurred by Shell in drilling, completing, and supervising the operations of the unit. The recovered costs were to be collected *569 by Shell from proceeds received from that portion of the well's production attributable to the interests of the non-consenting owners. Wright's interest in the 320-acre "reformed" unit was 19.088 percent, or 61.082 mineral acres.
Thereafter, Shell drilled five more wells in the Alcorn field to develop production from the Washita-Fredericksburg formation. Four of the five wells were producers. The average cost of the six wells drilled to the Washita-Fredericksburg formation (including the Shell-Cohn No. 2 dry well) was $1,247,067.00. It was stipulated by Wright and Shell that this sum ($1,247,067.00) is a reasonable cost of a well drilled to the Washita-Fredericksburg formation.
After learning that the Shell-Cohn No. 1 320-acre "reformed" unit well had been completed and was considered a producer, Wright requested from Shell information about well costs and the status of the well. On July 31, 1981, Shell wrote to Wright advising him that the cost of the well was $7,353,706.89 (this was later changed to $7,599,973.00), and that a sales contract for the gas produced from the Washita-Fredericksburg formation was being negotiated.
On August 17, 1981, Wright advised Shell that it was his understanding that he was not responsible for the cost of drilling to the deep formation at 21,500 feet, but that he was responsible only for the cost of drilling to the productive formation at approximately 10,500 feet. Wright also requested that additional information be provided concerning the well costs.
On July 29, 1983, Shell wrote to Wright stating that the gas from the Washita-Fredericksburg formation had been sold to Southern Natural Gas and that a pipeline was being constructed to the well site. Shell projected that first deliveries would be taken during the third quarter of 1983. Shell included with its letter an accounting statement showing the costs of the 21,500-foot well.
First commercial production was obtained in January of 1984, when gas deliveries from the 320-acre Shell-Cohn Unit No. 1 began to be made to Southern Natural. On March 23, 1984, Wright's attorney wrote to Shell demanding that Shell bill Wright for the reasonable costs to drill and produce from the productive zone (10,509 feet), not for the costs of drilling to the 21,500-foot non-productive depth. He also demanded that Shell provide complete production information, which was necessary to compute the amount of royalty payments to Wright's lessors. On April 2, 1984, Shell answered, giving general production and sales data, standing by its position as to Wright's share of the well costs, and advising Wright that Shell did not anticipate that the Shell-Cohn Unit No. 1 well would ever pay out.
Thereafter, Wright petitioned the State Oil and Gas Board, requesting that the Board determine what costs of drilling and completing the 320-acre or "reformed" Shell-Cohn Unit No. 1 well should be chargeable against Wright's non-consenting interest. After a hearing on the matter, the Board held that Shell was entitled to recover from Wright his pro rata share (19.088%) of Shell's $7,599,973.00 cost for drilling the 21,500-foot well on the 640-acre unit.
Wright appealed the Board's decision to the Circuit Court of Claiborne County. The circuit court, after considering the record, the parties' briefs, and oral argument of counsel, entered an opinion agreeing with the Board that Shell was entitled to recover from Wright his pro rata portion of the cost of the 21,500-foot well. According to the circuit court judge, "[the] hole that punctured the earth to a depth of 21,500 feet was the same hole from which commercial production was obtained." The judge disagreed with the Board, however, as to how Wright's share of the cost should be computed. The circuit judge found that Wright's share of costs should be computed as follows:
The expense of drilling the deep hole should be chargeable in equal proportions to each and every producing acre in the 640 acre tract. As a producer from a deep hole each and every acre of a non consenting owner among the 640 acre unit would be chargeable for the cost of drilling and development. Its costs was *570 [sic] $7,599,973.00 for drilling on the 640 acre unit and for completion as a producer at shallower levels on a reformed 320 acre tract.
The stipulated cost of drilling and completing a producer at the shallower levels was $1,247,067.00. Therefore $6,352,906.00 of the total cost of $7,599,973.00 was attributable to the deep hole drilled for the benefit of the entire 640 acre tract. One half of this cost ($3,176,453.00) is chargeable to the interest of the non-consenting owner as is the stipulated cost of $1,247,067.00 for drilling and completing a shallow hole at levels above 12,000 feet in units composed of 320 acre sites.
The appellant, Wright is chargeable with his proportionate share of the $4,423,520.00 cost based upon his 19.088% (61.082 acres) in the reformed 320 acre unit which was the sole producer on said acreage.
From the circuit court's judgment, Wright has appealed. Both the State Oil and Gas Board and Shell Oil Company have cross-appealed, objecting to the circuit court's modification of the Board's order.
Wright raises four issues before this Court, only one of which requires discussion.

DID THE STATE OIL AND GAS BOARD EXCEED ITS AUTHORITY BY CHARGING WRIGHT WITH THE COST OF A NON-PRODUCING UNIT?
This Court's standard for judicial review of an order of the State Oil and Gas Board is limited to determining whether the order 1) is supported by substantial evidence; 2) is arbitrary or capricious; 3) is beyond the power of the Board to make; or 4) violates some constitutional right of the complaining party. Pursue Energy Corporation v. State Oil and Gas Board of Mississippi, 524 So.2d 569, 571 (Miss. 1988); Damson Oil Corporation v. Southeastern Oil Company, 370 So.2d 225 (Miss. 1979).
The Oil and Gas Board stated in its order of November 21, 1985: "This well cost dispute involves only one well and only one unit the configuration of which was reformed by the Board in compliance with this Board's spacing rules so that same would contain one-half of the acreage originally included in the unit." The heart of Wright's argument is that, despite the Board's use of the word "reformed," the 320-acre Shell-Cohn Unit No. 1 is, in fact, separate and distinct from the original 640-acre Shell-Cohn Unit No. 1. Based on this premise, Wright argues that the Board exceeded its statutory authority in charging Wright's interest with the cost of developing the non-productive 640-acre unit. Wright contends that he should be charged only with the $1,247,067.00 cost of drilling to the productive Washita-Fredericksburg formation.
If the units are, as Wright contends, two separate and distinct drilling units, then Wright must prevail; for, Section 53-3-7(a) of the Mississippi Code of 1972 plainly provides that if production is not secured in paying quantities from a pooled drilling unit, then the operator of the unit cannot recover from a non-consenting owner any part of the costs of the non-productive unit. Section 53-3-7(a) states:
When two or more separately owned tracts of land are embraced within an established drilling unit, the person owning the drilling rights therein and the rights to share in the production therefrom may validly agree to integrate their interests and to develop their lands as a drilling unit. Where, however, such persons have not agreed to integrate their interests, the board may, for the prevention of waste or to avoid the drilling of unnecessary wells require such persons to integrate their interests and to develop their lands as a drilling unit. All orders requiring such pooling shall be made after notice and hearing, and shall be upon terms and conditions that are just and reasonable, and will afford to the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense.
The portion of the production allocated to the owner of each tract included in a drilling unit formed by a pooling order shall, when produced, be considered as if *571 it had been produced from such tract by a well drilled thereon. In the event such pooling is required, the cost of development and operation of the pooled unit chargeable by the operator to the other interested owner or owners shall be limited to the actual expenditures required for such purpose, not in excess of what are reasonable, including a reasonable charge for supervision. When production of oil or gas is not secured in paying quantities as a result of such forced unitization, the operator shall have no charge against the non-consenting owner or owners. In the event of any dispute relative to such costs, the board shall determine the proper costs, after due notice to all interested parties and hearing thereon. Appeals may be taken from such determination as from any other order of the board.[1]
(Emphasis added). The statutory provision which grants to the Oil and Gas Board the power to regulate drilling and production is § 53-3-5 of the Mississippi Code of 1972. It states in part:
For the prevention of waste, to protect and enforce the correlative rights of the owners in a pool, and to avoid the augmenting and accumulation of risks arising from the drilling of an excessive number of wells, or the reduced recovery which might result from too small a number of wells, the board shall, after a hearing, establish a drilling unit or units for each pool.

(Emphasis added). The definition of "drilling unit" is provided in § 53-1-3(l) of the Mississippi Code of 1972:
"`[D]rilling unit' shall mean the maximum area in a pool which may be drained efficiently by one well so as to produce the reasonable maximum recoverable oil or gas in such area."
The State Oil and Gas Board, by authority granted to it under Miss. Code Ann. § 53-3-5 (1972), has determined that ordinarily the maximum area which can be effectively drained by one gas well is 640 acres where the gas pool is found at a depth below 12,000 feet, and 320 acres where the pool is found at a depth at or above 12,000 feet. Rule 8, Statewide Rules and Regulations. Although, technically, Mississippi does not unitize by strata as do some other states, the Board's rules requiring different size units for wells drilled at different depths have the effect of unitizing by strata. In essence, all depths from zero to 12,000 feet below the surface form one stratum; all depths below 12,000 feet form another stratum. Reading the Board's spacing rules in conjunction with the statutory definition of "drilling unit," it would be impossible to reform a drilling unit which covered only depths below 12,000 feet to a unit covering only depths at or above 12,000 feet. The two strata are mutually exclusive. We hold that true reformation of a unit can properly be made only within a given stratum. This position is not inconsistent with the holding of Stacy v. Tomlinson Interests, Inc., 405 So.2d 93 (Miss. 1981). In Tomlinson this Court upheld the Oil and Gas Board's order reforming a 640-acre gas drilling unit to an 80-acre oil drilling unit. But the reformation in Tomlinson did not require moving the unit from one "stratum" to another. Under spacing rules for oil wells, wells drilled to depths below 12,000 feet must be on 80-acre units, while wells drilled to depths at or above 12,000 feet must be on 40-acre units. Rule 7, Statewide Rules and Regulations. So the reformed 80-acre oil drilling unit covered all depths below 12,000 feet, just as had the 640-acre gas drilling unit. Furthermore, Tomlinson does not control the instant case because the question before this Court in Tomlinson was not whether the 640-acre gas unit could have been reformed to an 80-acre oil unit, but rather whether the Oil and Gas Board was justified in making the 80-acre oil unit a north/south unit instead of an east/west unit.
In the present case, the Board noted in its order that there had been no depth *572 restriction in its authorization of the original 640-acre Shell-Cohn Unit No. 1 well. But it goes without saying that it would be absurd to put a depth restriction on a well authorized for all depths below 12,000 feet. How could an operator possibly get to the 12,000-foot depth without penetrating all depths above 12,000 feet? That there was no depth restriction on drilling the well does not mean, however, that there was no depth restriction on production. Under the Board's spacing rules, production attributable to the 640-acre unit could come only from those zones more than 12,000 feet below the surface. The very reason that Shell was required to petition the Board to force pool and integrate the 320-acre unit was that the gas found in the Washita-Fredericksburg formation at a depth of approximately 10,500 feet could not be produced from the 640-acre unit.
Shell nevertheless argues that Wright should be charged with a pro rata share of the cost of the deep well, because, according to Shell, all wells are drilled deeper than the depth at which they are ultimately completed. In support of its argument Shell cites Martel v. Hunt, 195 La. 701, 197 So. 402 (1940). In Martel an oil well was drilled on land in which the plaintiffs owned a one-fourth interest. The well was drilled to a total depth of 7,327 feet, but produced no oil from that depth. It was then plugged back to a depth of 3,949 feet, from which it produced oil. The Supreme Court of Louisiana held that the plaintiffs were liable for their pro rata share of the cost of drilling to the 7,327-foot depth, even though production was completed at a shallower depth. In the present case, if the gas had been found at any depth covered by the 640-acre unit, that is, anywhere below 12,000 feet  Martel might be applicable. For example, if Shell had found gas in paying quantities in the 15,600-foot-deep Hosston formation, then Wright might properly be charged with his share of the expenses of drilling to the 21,500-foot depth, assuming the expenses were reasonable. In that situation, the drilling costs to the deeper level would be a "cost of development and operation of the pooled unit." Miss. Code Ann. § 53-3-7(a) (1972) (emphasis added). But where, as here, production was completed at a depth above 12,000 feet, in a 320-acre unit, the cost of drilling to the 21,500 depth in a 640-acre unit is not a "cost of development and operation of the pooled unit," and Martel is inapposite.
The instant case is somewhat analogous to the case of Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416 (1954). In Wilcox, the Louisiana Commissioner of Conservation had issued an order establishing a 160-acre drilling unit for formations designated as the "FX" and the "FV" sands. Shell drilled a well on this unit to the "FX" and "FV" sands, but neither of these sands was productive. In the course of drilling to those sands, however, Shell encountered a sand designated as the "FT" sand, which showed production potential. The "FT" sand was not included in the Commissioner's order and was not subject to forced pooling under the order. The Supreme Court of Louisiana held that "[s]ince no production was obtained from the FX and FV sands, this well ... was a dry hole as to the unit established for these sands by [the Commissioner's] Conservation Order... ." 226 La. at 422, 76 So.2d at 419. See also Grigsby v. Department of Energy, 585 F.2d 1069 (Temp.Emer.Ct. App. 1978); LeSage v. Union Producing Co., 176 So.2d 777 (La. App. 1965) rev'd on other grounds, 249 La. 42, 184 So.2d 727 (1966). Applying Wilcox to the present case, the 21,500-foot well drilled by Shell in the 640-acre Shell-Cohn Unit No. 1 was a dry hole as to that unit. It was productive only as to the 320-acre unit. Under § 53-3-7(a), it is not the cost of the well that is chargeable to a non-consenting owner, but the cost of the pooled unit. In many instances, the ownership interests in a 640-acre unit and a 320-acre unit both drilled by the same well will be different.[2] *573 Any problems that might arise out of such a situation are avoided by the provision of § 53-3-7(a) which limits the amount chargeable against a non-consenting owner to the cost of development and operation of the pooled unit. Therefore Wright can properly be charged only with the cost of drilling the well within the 320-acre, above-12,000-feet, unit.
Marathon Oil Company v. Corporation Commission, 651 P.2d 1051 (Okla. 1982), cited by appellees, is inapplicable to the present case. First of all, Oklahoma's forced pooling statute, 52 Okla. Stat. Ann. § 87.1(e) (Supp. 1988) (formerly § 87.1(d)), unlike § 53-3-7(a) of the Mississippi Code of 1972, does not exempt a non-consenting owner from the cost of drilling a unit when the unit well results in a dry hole. Instead, the Oklahoma Corporation Commission is authorized to make provisions in its pooling orders for the payment of the cost of development and operation of a unit. Second, as the circuit judge stated in his opinion, Marathon "allocates development cost in a deep formation where the poolee does not own an interest in the shallower producing formation." That is not the situation in the present case. In Marathon, the Corporation Commission issued an order force-pooling Marathon's interest in a 640-acre drilling unit. Marathon's interest in the unit included a 150-acre interest in all formations in the northwest quarter and a 160-acre interest in all formations below the "Atoka" formation in the southeast quarter. All of the formations in the unit were subject to 640-acre spacing except the Atoka, which was spaced for 160-acre units. The operator of the unit proposed to drill a well in the northeast section of the quarter, with the well to serve as the Atoka unit well for that quarter section and also as the unit well for the entire 640-section in the other formations. The Commission's order provided Marathon with two options: Marathon could elect to take a bonus and royalty in exchange for its working interest, or pay its proportionate share of the total cost of the well, even if the well proved to be non-productive. Marathon objected to the order on the grounds that it would require Marathon to pay for a portion of the cost of the well to the Atoka formation, which was almost certain to be productive, but from which Marathon would not benefit. The Supreme Court of Oklahoma held that it was proper to assess Marathon for its proportionate share of the entire cost of the test well, stating: "The bore must pass through all intermediate strata before reaching the target formation... ." 651 P.2d at 1053.
While the facts of Marathon do not fit the present case, applying its logic in no way weaken's Wright's position. In the present case, if the 21,500-foot well drilled by Shell had been productive in the deeper zone, Wright could not object to sharing the cost of drilling to the Washita-Fredericksburg formation, even if he had owned no interest in the 320-acre unit covering the shallower zone, because the well would have had to pass through the shallower formation in order to reach the greater depth. But that is very different from assessing Wright for the cost of the 21,500-foot well which was unproductive in the deeper zone. The well bore in this case certainly did not have to pass through the deeper zone in order to reach the Washita-Fredericksburg formation.
The appellees make much of a footnote in Marathon which states: "A completion in a formation not owned by a poolee and a non-productive target formation would render equitable a recovery of contributed drilling expenses out of first production by *574 the non-owning poolee." 651 P.2d at 1053 n. 1. But this footnote, which was not a part of the court's holding, referred to recovery by the non-consenting interest owner of his contribution to the expenses of drilling a non-productive target. In the present case, it is the operator, Shell, who is trying to recover the expenses of drilling to a non-productive target. Even if Marathon were applicable to the present case, the protections afforded by § 53-3-7(a) to a non-consenting interest owner are not necessarily afforded to an operator. In contrast to the non-consenting interest owner, who is an unwilling participant, the operator of the unit has made a deliberate choice to drill. There is simply no merit to appellees' argument in this regard.
We hold that the 640-acre Shell-Cohn Unit No. 1 and the 320-acre Shell-Cohn Unit No. 1 (erroneously called a "reformed" unit) are two separate and distinct drilling units, or production units. Since the 640-acre unit was a non-productive unit, the Oil and Gas Board acted beyond its statutory authority in charging Wright with any part of the costs attributable solely to that unit. Wright should be chargeable only with 19.088% of $1,247,067.00, the stipulated cost of drilling and completing the Shell-Cohn Unit No. 1 well to the Washita-Fredericksburg formation.
We reverse the judgment of the circuit court and adjudicate that the proper amount to be charged to Wright, out of production, for the cost of drilling and completing the 320-acre Shell-Cohn Unit No. 1 is $238,040.14. The cross-appeal is dismissed.
REVERSED AND RENDERED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
PRATHER, J., not participating.
NOTES
[1] This is the version of Miss. Code Ann. § 53-3-7(a) which was in effect at the time of the forced pooling at issue in the present case. The statute has since been amended, first in 1984, and again in 1987.
[2] An illustration will show the anomalous result that could be reached if the appellees' position were sustained. Suppose that all of Wright's 124-acre interest had been on the east half of the 640-acre unit where the deep well was drilled. While Wright's percentage interest in the 640-acre Shell-Cohn Unit No. 1 would have been about 19%, his interest in the 320-acre Shell-Cohn Unit No. 1 would have been approximately 38%. Under the appellees' theory, Wright would be chargeable for 38% of the cost of the deep well even though he had stood to receive only 19% of the proceeds from production in the deep zone had the well been productive in that zone. That these costs would not have to be paid directly by Wright, but instead would be chargeable against Wright's portion of production from the Washita-Fredericksburg formation, does not render the result any less untenable.

A party could conceivably own an interest in the 320-acre unit encompassing the shallower stratum and yet own no interest in the 640-acre unit encompassing the deeper stratum. It would be grossly unfair to charge that party for the costs of the deep well when he had no interest whatsoever in the deeper stratum.