76 So.2d 416

**Eugene C. WILCOX et al.**

v.

**SHELL OIL COMPANY.**

No. 41529.

July 2, 1954.

Applications for Rehearing Filed on
July 14 and 15, 1954.*

* Pending applications for a rehearing the case was compromised and on joint mo-tion of counsel was dismissed with preju-dice.

Kaufman, Anderson & Leithead, Lake Charles, for plaintiffs-appellants.

W. W. Westerfield, Jr., Geo. C. Schoenberger, Jr., New Orleans, for Shell Oil Co., defendant-appellee.

Herschel Knight, Jennings, for J. S. Abercrombie and other Royalty Owners, defendants-appellees.

HAWTHORNE, Justice.

Plaintiffs-appellants as landowners instituted this suit seeking the cancellation of an oil and gas lease in which Shell Oil Company, defendant-appellee, is the lessee and which covers 550 acres of land in the Iowa Field in the Parish of Jefferson Davis. Plaintiffs allege that the lease terminated because Shell did not elect to drill or pay the delay rental as provided therein. From a judgment rejecting their demands they have appealed.

The lease which plaintiffs seek to have cancelled is dated September 3, 1948, and is for a five-year primary term ending on September 3, 1953, and provides for a yearly delay rental of $2,750 for the privilege of deferring drilling operations for a period of 12 months. No well was drilled by the lessee on this leased property (which we shall hereafter call the Wilcox land), nor was there any payment of the delay rental for the privilege of deferring operations beyond *September 3, 1952;* or, in other words, *lessee did not drill on the property and did not pay the delay rental on September 3, 1952.*

Shell contends that the lease was nevertheless maintained in effect because there was on the rental date a producing well on a unit formed under the terms of the lease of which 20 acres of the Wilcox land was a part, and that this production maintained the lease in force. The lessors contend that the production from this well could not keep the lease in effect because the unit was formed after production was obtained and the well was not commenced or completed on the unit, and that therefore this production could not be considered production from the Wilcox lands.

To understand fully how this issue arose it is necessary to review the facts in connection with the drilling of the well.

On June 14, 1951, the Commissioner of Conservation issued Order 39–B establishing drilling units in the Iowa Field of approximately 160 acres each for what was designated as *the FX and the FV sands.* In this order the SW¼ of Section 5, Township 9 South, Range 6 West, was designated as a drilling unit for these sands. Appellee Shell was granted a permit by the Conservation Department to drill on the unit thus formed in the SW¼ of Section 5, which consisted of 80 acres of the Wilcox lands and 80 acres of land adjoining and to the west thereof, which were covered by a lease obtained by Shell from the Breaux Estate containing provisions identical with those of the Wilcox lease. Under this permit Shell on May 4, 1952, commenced the drilling of a well on this unit on property covered by the Breaux lease, and not on the Wilcox land. The well was drilled to, and penetrated, both the FX and the FV sands, the sands pooled by Conservation Order 39–B. Neither of these sands proved to be productive. In this drilling operation a sand designated as the *FT sand* was encountered, which showed productive possibilities. *This FT sand was not affected by Order 39–B, and was not subject to forced pooling under the provisions of this order.* The well was completed as a producer in the FT sand on *August 6, 1952,* and on *August 31* was placed on production from this sand and has produced therefrom since that date.

■ Since no production was obtained from the FX and the FV sands, this well on the Breaux property was a dry hole as to the unit established for these sands by Conservation Order 39–B, and on September 3, 1952, delay rental date under the lease, there were not on this unit as provided in Section 6 of the lease, from which we quote, " * * * operations in progress for the drilling of a well or reworking operations on said land or unitized area hereunder, nor production from any thereof * * *". Consequently the completion of the well to the FX and the FV sands on the drilling unit formed under Conservation Order 39–B without production from these sands did not keep the lease in effect without payment of the delay rental on September 3, 1952.

In order to keep the Wilcox lease alive, therefore, Shell was faced, as the rental date of the Wilcox lease approached, with the alternative of commencing drilling on the Wilcox land or paying the delay rental. To avoid both of these alternatives Shell formed an operating unit in an attempt to cause production from the FT sand to be considered production under the Wilcox lease. This was very much to its interest because by it Shell could save a rental payment of $2,750 and at the same time avoid the expense of drilling a well on the Wilcox lease within the 12 months remaining of the primary term in an effort to keep it alive beyond that term.

Shell, then, instead of paying the delay rental on September 3, 1952, or commencing operations before the rental date for the drilling of a well, proceeded without the knowledge of the lessors to pool, or form an operating unit, as to the FT sand under the provisions of Section 5 of the lease. This unit consisted of 20 acres of the Wilcox land and 20 acres of the Breaux land, with the well on the Breaux land near the center of the unit. Without the knowledge of the plaintiffs, Shell had this declaration of pool filed with the clerk of court in Jennings, Louisiana, on September 2, 1952, the day before the delay rental date.

Appellee Shell Oil Company contends that *production* from the FT sand from the well on the operating unit formed under the provisions of the lease kept the Wilcox lease in full force and effect without the necessity of its paying the delay rental or having on the rental date operations in progress for the drilling of a well, and that by such production the lease is still in full force and effect even beyond its primary term since the well is still producing.

For a solution of the problem presented by this case, we are called upon to interpret the provisions of the lease, particularly Sections 4, 5, and 6, all of which must be considered together. The pertinent provisions of those sections read as follows:

"4. If operations for the drilling of a well be not commenced on said land, or any unitized area hereunder, on or before the 3rd day of September, 1949, this lease shall terminate, unless Lessee on or before that date pays to the lessor a rental of Twenty seven hundred and Fifty & No/100 Dollars, which payment shall cover the privilege of deferring commencement of operations for the drilling of a well for twelve months from said date. In like manner and upon like payments, during the primary term, the commencement of such operations may be further deferred for like periods of the same number of months successively. * * *

"5. Lessee shall have the right as to all or any part of the land herein leased, without lessor's consent to combine the lease, mineral and royalty rights, owned by lessor and lessee and created by this lease, with any other lease or leases, mineral or royalty rights in and under any other tract or tracts of land, whether owned by lessor or some

other person or corporation, so as to create, by the combination of such leases, royalty and mineral rights, one or more operating units, provided that no one operating unit shall embrace more than 40 acres * * *. Said combined areas are herein sometimes referred to as 'unitized area'. Any operating unit created hereunder shall be a continuous and unbroken tract of land without intersection or division by any acreage not embraced within such unit. In the event any such operating unit is so created by lessee, then lessee shall promptly file with the Clerk of Court a written designation of such unit indicating the unit so created and the several tracts of land combined into such unit. In the event production of oil, gas or other minerals is obtained upon any unit or units created hereunder, lessor shall receive and will accept on account of any such production, regardless of whether or not such production is from any part of the land hereinabove described, a royalty equal to such portion of a one eighth royalty as the number of acres of this lease and included in any such operating unit bears to the total number of acres included in the respective operating unit. * * * *The commencement of a well or the completion of a well to production, and the production of oil or gas therefrom, on any portion of an operating unit in which all or any part of the land described herein is embraced shall have the same effect, under the terms of this lease, as if a well were commenced or completed on the land embraced by this lease.* * * *

"6. If on any rental date there be neither operations in progress for the drilling of a well or reworking operations on said land or unitized area hereunder, nor production from any thereof, this lease shall not terminate if lessee on or before said date shall make or resume payment of rentals as herein set forth * * *." (All italics ours.)

Under Section 4, if operations for the drilling of a well are not commenced on the lease or any unitized area before a rental date, the lease will terminate unless the lessee pays the delay rental stated. Payment of the rental will allow deferment of commencement of operations for the drilling of a well for 12 months from the rental date.

Under Section 6, if on any rental date there are neither operations in progress for the drilling of a well or reworking operations on the land or a unitized area nor production from any thereof, this lease would not terminate if lessee on or before that date should make or resume the payment of rentals as provided in the lease. Under the facts of this case, on the rental date, September 3, 1952, there were neither operations in progress for the drilling of a well nor reworking operations, as that term is defined in the lease, on the land or the operating unit formed by Shell under the lease. However, it is the contention of appellee that *production* from the FT sand on this date on the operating unit relieved it from the necessity of making the delay rental payment to keep the lease alive.

The language of Section 5 refutes the contention that the production from the FT sand on the rental date was production under Section 6 that obviated the necessity of a rental payment. Under Section 5, the lessee could without the lessors' consent combine the lease with any other lease to create an operating unit or "unitized area" not to exceed 40 acres. If the lessee created such an operating unit, and if production of oil, gas, or other minerals was obtained upon such unit, the lessors were to receive and accept their proportionate part of the one-eighth royalty.

Thus it will be seen that Section 5 permits pooling and provides for the manner of combining lessors' lands with the lands of another to form an "operating unit". Further, it sets forth what operations by the lessee on the unit, although not on the lands of the lessors contained in the unit, would have the same effect as if these operations were conducted on the lands described in the lease. The portion of Section 5 which sets forth these operations reads as follows: *"The commencement of a well or the completion of a well to production, and the production of oil or gas therefrom, on any portion of an operating unit in which all or any part of the land described herein is embraced shall have the same effect, under the terms of this lease, as if a well were commenced or completed on the land embraced by this lease."*

The operations on the unit of which lessors' land *is* a part, but not on their lands

contained in the unit, *which have the same force and effect as if conducted on the lands described in the lease are:*

(1) Commencement of a well on *the unit,* or (2) completion of a well to production on *the unit,* or (3) production from a well *completed to production on the unit.*

■ In the instant case it will be recalled that the well drilled on the Breaux land was commenced on May 4, 1952, completed to production in the FT sand on August 6, 1952, and the unit was formed on August 25, 1952, and filed for record on September 2, 1952. This well therefore was (1) not commenced on this unit, (2) not completed to production on this unit, and (3) production was not from a well completed to production on this unit, because *each of these operations took place prior to the existence or establishment of the operating unit.* Consequently, under the provisions of the lease, *not one of these operations can be considered to have the same force and effect as if conducted on the land of the Wilcoxes, the lessors.* The production relied upon by Shell to keep the lease in force, therefore, cannot be considered as if it were production on the Wilcox land because for production from the unit to be considered production from the Wilcox lease it would have to be from a well completed to production on the unit. Thus, although there was a producing well on the unit on the rental date, that well was completed to production before the unit was formed, and

production from it is not considered as production from the Wilcox lease.

This answers Shell's contention that production obtained from the Breaux well by lessee in the FT sand prior to September 3, 1952, relieved it from the payment of the delay rental to the lessors under Section 6 of the lease, which provides that lessee will be relieved of delay rental payments if production is being had from the leased premises or from an operating unit. This production from the well drilled on the Breaux lands did not have the same force and effect as if it had been obtained on the the Wilcox property because it was production obtained from a well *completed to production prior to the formation of the operating unit.*

Further corroboration of our interpretation of the lease that production from a well on the Breaux lease completed to production before formation of the unit cannot hold the Wilcox lease is this portion of Section 5: "In the event production of oil, gas or other minerals *is obtained upon any unit or units created hereunder,* lessor shall receive * * *" a proportionate share of the royalty. This provision contemplates a sharing of royalty only when production is obtained upon a unit.

Shortly after production was obtained in the Breaux well, lessee Shell sent to each one of the plaintiffs, Eugene C. Wilcox and Mrs. Grace Wilcox Steele, residents of the State of Minnesota, and Mrs. Bonnibel Miller, a resident of the City of New Orleans, a division order which was signed by them in November, 1952. In this division order they certify that they are the legal owners of, and warrant their title to, their respective interests in the oil produced from the Shell Oil Company well on the Breaux Estate-Wilcox unit containing 40 acres, and the division order recites that it covers the oil and gas produced from the FT sand only. Under this division order one of the plaintiffs, Eugene C. Wilcox, endorsed and cashed four royalty checks, but the amount of these checks prior to the institution of this suit was tendered to Shell in his behalf and was refused.

Shell argues that by signing the division order all of the lessors approved the pooling by Shell because that was the only way they were entitled to royalty from the Breaux well, and thus their acts show their interpretation of the lease provisions. Shell relies on Article 1956 of the Civil Code, which provides:

"When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation."

This argument would be valid if Shell could have proved that the parties knew that they were to receive the royalty by virtue of a declaration of pool made and filed after production was obtained. Shell

not only failed to prove their knowledge, but there is positive proof that they did not know of the pooling by Shell when they signed the division order. The district judge himself found:

"Neither plaintiff [Eugene Wilcox or Mrs. Steele] had any knowledge of the filing of the Declaration of Pool which was filed September 2, 1952, until the deposition was taken on June 13, 1953. * * *

"The third plaintiff, Mrs. Bonnibel Doan Miller, * * * did not know anything about the filing of the Declaration of Pool until December, 1952. * * *"

Moreover, it is not established that these plaintiffs knew at the time they signed this division order that Shell had formed an operating unit under the lease. On the contrary, they may well have believed that they were to be paid the amount set forth in the division order by virtue of the forced pooling under Order 39–B of the Department of Conservation, as it was never established that they were familiar with what was meant by the letters used to designate the various sands, such as FT, FV, and FX.

Shell also contends that these plaintiffs have acquiesced in the formation of the operating unit, and that they are now bound by this acquiescence and are estopped to argue that the lease has terminated. This contention is based on the fact that all plaintiffs signed the division order and one of them, Eugene C. Wilcox, received and cashed four royalty checks, and that as a result of the division order they all knew that a unit had been formed which applied only to the FT sand and that the well drilled was not on their land.

■ There is no merit in this contention because the plaintiffs signed the division order, and one of them accepted royalty checks, without knowledge of the existing facts. It is certain that the unit was formed by Shell without plaintiffs' knowledge. It was not proved by Shell that the plaintiffs had any knowledge of the unit formed by it under the provisions of the lease. The well had been drilled on a unit established by an order of the Conservation Department for the FX and the FV sands, and it was not proved that these plaintiffs had any knowledge that a unit was formed by Shell as to the FT sand after the Breaux well had been completed to production. The division order covered only production from the FT sand. However, it is not shown that these plaintiffs knew anything of the sand formations or the significance of the various letters designating these formations. Mr. Wilcox, who accepted the four royalty checks, was 86 years old at the time his deposition was taken in this case, and his testimony leaves it completely doubtful that he understood even then the complicated

facts regarding how he got his royalty checks.

■ Appellee also relies on an exception of no cause of action, arguing that the lease is indivisible, and that, inasmuch as the royalty vendees of the lessors are opposed to the cancellation of the lease, the lessors have no cause or right of action. There is no merit in this exception because none of the obligations contained in the lease is an obligation of the royalty owners, and none of the obligations of the lease is owed to the royalty owners. Since the lessee failed to keep the lease in effect by complying with its provisions, the lease is subject to cancellation in its entirety. Such a cancellation would not divide the lease.

■ Plaintiffs pray for judgment in the sum of $2,500 as attorney's fees, based on the fact that they had made written demand on defendant lessee for the cancellation of the lease pursuant to the provisions of R.S. 30:102, and that the lessee had failed to comply with this demand. Considering the issue involved—the right of cancellation of an oil and gas lease covering property in a proven oil and gas field—, the work done by the attorneys representing plaintiffs as reflected by the record, the value of the property which consists of 550 acres of a value in excess of $25,000, and the evidence adduced, we think that the amount prayed for is a reasonable fee

for services rendered these plaintiffs by their attorneys in this case.

For the reasons assigned the judgment appealed from is reversed, and it is now ordered that judgment be rendered herein in favor of plaintiffs-appellants and against defendant-appellee, Shell Oil Company, decreeing terminated and cancelled as of September 3, 1952, the mineral lease described in the petition on the following described property, situated in Jefferson Davis Parish, Louisiana:

Southwest quarter (SW ¼) of Section 4; Southeast quarter (SE ¼) and East half of Southwest quarter (E ½ of SW ¼) of Section 5; South half of Northeast quarter (S ½ of NE ¼) of Section 5; Southwest quarter of Southeast quarter of Northeast quarter (SW ¼ of SE ¼ of NE ¼) of Section 11; all in Township 9 South, Range 6 West, Louisiana Meridian.

It is further ordered that this lease be cancelled from the conveyance records of Jefferson Davis Parish, Louisiana, all as prayed for by plaintiffs in their petition. It is further ordered that there be judgment in favor of plaintiffs-appellants and against the defendant-appellee in the full sum of $2,500 as attorney's fees, with legal interest thereon from judicial demand. Appellee is to pay all costs.