141 So.2d 649 (1961)
243 La. 48
J. Holbert ODOM
v.
UNION PRODUCING COMPANY et al.
No. 45651.
Supreme Court of Louisiana.
December 11, 1961.
On Rehearing April 30, 1962.
Rehearing Denied June 4, 1962.
Wilkinson, Lewis, Madison & Woods, Shreveport, for relator, defendant-appellee.
Shaw & Shaw, Homer, for respondents.
Doyle, Smith & Doyle, George C. Schoenberger, Jr., New Orleans, Oliver, Digby & Fudicker, Monroe, Lishow & Lewis, Lake Charles, for amicus curiae.
HAMLIN, Justice.
This action was brought for the cancellation of an oil, gas, and mineral lease covering certain described lands in Sections Thirty-Two and Thirty-Three, Township Twenty-Three North, Range Six West, Claiborne Parish. From a judgment of the trial court rejecting their demands at their costs, plaintiffs appealed to the Court of Appeal, Second Circuit; they acquiesced in that part of the judgment of the trial court affecting Section Thirty-Three, but *650 they pursued their appeal with respect to Section Thirty-Two. The Court of Appeal ordered the cancellation of the lease, insofar as it bore upon Section Thirty-Two. In the exercise of our supervisory control (Art. VII, Sec. 11, La.Const.1921-LSA), we directed certiorari to said Court of Appeal for review of its judgment.
The following plat, copied from the Appendix of relator's brief, shows the sections involved in this litigation and the wells thereon.

The facts of record are ably recited by the Court of Appeal in its opinion (129 So.2d 530), and only those necessary for our decision will be reiterated.
On March 10, 1947, plaintiff J. Holbert Odom (he died after filing the present action, and his heirs were substituted as parties plaintiff) and A. B. Greer (Odom later acquired Greer's interest in the land), lessors, and Union Producing Company, lessee, executed an oil, gas, and mineral lease (La. 14 A Rev. with Pooling Provision 1M 4-46, prepared by Union Producing Company for its use in this area and furnished by said company), covering approximately one hundred and thirty-eight (138) acres in Claiborne Parish, for a primary term of ten years from May 26, 1947[1] and as long thereafter as oil, gas, sulphur or other minerals or any of them were produced from the land by the lessee or the obligations in lieu of production were fulfilled. The plat, supra, shows that ninety-eight acres of the Odom property were located in Section Thirty-Two and forty acres were located in Section Thirty-Three.
*651 On December 31, 1956, effective from and after January 1, 1957, the Commissioner of Conservation of the State of Louisiana issued Order #291-A, establishing drilling units for the Taylor Sand of the Colquitt Field of Claiborne Parish. One of the units so established by the order was the South Half (S/2) of Section 33, Township 23 North, Range 6 West, containing 320 acres, more or less, in Claiborne Parish, Louisiana, known as Union Producing Company et al. Tigner Unit. This unit included forty acres covered by the aforementioned lease, being the SW/4 of the SW/4 of Section 33. Production was secured on this unit but not on plaintiff's and; the well was spudded in on March 4, 1957, and drilling continued thereafter until it was plugged back and completed on May 6, 1957 in the Taylor Sand as a producer of gas with associated liquid hydrocarbons. The well was then shut in, but it was thereafter placed on production on July 27, 1957.[2] In view of the holding of Delatte v. Woods, 232 La. 341, 94 So.2d 281, plaintiffs conceded that the lease, insofar as it affected the SW¼ of SW¼ of Section 33, was preserved by the operation on this unit.
Preparations for the drilling of Union Producing Company et al. Tigner Unit No. A-1 Well, located in the SE/4 of NE/4 of Section 32, Township 23 North, Range 6 West, were commenced on February 27, 1957; the well was spudded in on March 3, 1957, and drilling continued thereafter with due diligence until the well was drilled to a total depth of 9030 feet, whereupon it was plugged back and completed as producer of gas and associated liquid hydrocarbons in the Taylor Sand. The Tigner No. A-1 Well was shut in but was thereafter connected to Arkansas Louisiana Gas Company's pipe line on July 27, 1957, when production was commenced. By an instrument dated May 15, 1957, filed for Registry on May 20, 1957, Union Producing Company filed a declaration of unitization, designating a unit containing 230 acres. This acreage embraced the lands of plaintiffs located in Section 32; the Tigner No. A-1 Well was not situated on their property.[3] On June 11, 1957, Union Producing Company wrote to Mr. J. H. Odom, informing him that a check for $21.30 was enclosed,[4] being full payment of shut-in royalty for the period from April 24, 1957 to July 24, 1957, Tigner "A" Unit Well No. 1, located in the NE¼ of Section 32.
On May 27, 1957, attorneys for J. H. Odom wrote to Union Producing Company demanding a release of the lease, alleging that it had expired under its own terms and that the demand was being made in accordance with LSA-R.S. 30:102.
In a reply of June 7, 1957, Union Producing Company stated, "All of the land covered by this lease, which is located in Section 33, Township 23 North, Range 6 West, is included in a forced unit created by the Department of Conservation on December 31, 1956, by its Order No. 291-A of that date. All of the land covered by this lease and located in Section 32, Township 23 North, Range 6 West, is included in a voluntary unit declared on May 15, 1957, as amended by instrument dated May 23, 1957, both the original unit declaration and the amended declaration having been executed pursuant to the provisions of the said lease."
After a further exchange of correspondence, in which Union Producing Company declined to surrender the lease, the present action was filed on July 29, 1957.
Plaintiff contended that the lease expired by its own terms as to the land located in Section 32 because this portion of the lease was severed from the remainder when the land in Section 33 was placed in a pooled *652 unit, which we shall designate as the Conservation Unit. Conceding that the decision of Delatte v. Woods, supra, had the effect of keeping in force and effect the lease as to the portion of the land in Section 33, plaintiff contended that the lease was divided and that anything outside the Conservation Uniteven though it fell within the leasewas not so affected. Plaintiff relied on Paragraph 14 of the lease, which shall be quoted infra. Plaintiff argued that the Tigner Unit No. A-1 Well, which we shall hereinafter designate as being in the voluntary unit, was not equivalent to production within the primary term of the lease.
The trial court stated that it understood the law to be that "the production in the unit well in which the lands leased in Sec. 32 are located was a sufficient compliance with the terms of the lease and of the legal requirements to keep all property within the unit in position to share the fruits from that unit; but, previous to that, the production on the unit which included the leased lands in Sec. 33 had the effect of keeping the lease itself in full force and effect."
In speaking of the voluntary unit, the trial court stated that its holding would be different in this case "if it were brought to the attention of the Court that what is called a producing well on a unit is not an actual fact, and that the payment of shut-in royalties is a mere subterfuge for the purpose of holding the lease in force." The trial court further said that its failure to follow the logic of plaintiff's position was due to the fact that "we have the conviction that there are several premises on which the plaintiff's position is based, which we believe are erroneous. The first is that the termination of the primary term of the lease in question in the instant case is the date of the lease, or March 10, 1957, whereas the lease itself plainly specifies that the date is May 26, 1957. * * * The third is the false presumption that an oil and gas lease is divisible after the establishment of a pooling unit, with production on the unit after the unitization takes place, and with production taking place within the primary term. * * * The fourth erroneous presumption is that lessee is able to destroy the effect of the Conservation order by the establishment of a voluntary unit which would divide the obligations of the lease * * * but, in considering what has taken place on a unit where the original lease includes any property in that unit, we are impressed with the present holdings of our Supreme Court, that such a lease is indivisible in the obligations."
The trial court concluded:
"In this case we are not convinced that the defendant had reasons for establishing a voluntary unit other than for the purpose of securing production according to the terms of the lease, or production within the primary term, on all the lands included in the lease, also, that he did secure such production."
In rejecting defendant's contentions that (1) the Tigner Unit Well located in the South Half (S½) of Section 33 had the effect of maintaining the entire lease in force beyond its primary term since the order of the Conservation Commissioner creating the Tigner Unit did not have the effect of dividing the lease, and (2) even if it should be considered that the lease was divided by the Commissioner creating the Tigner Unit, nevertheless, that portion of the lease which lies in Section 32 was maintained in force by virtue of the drilling and completion of the Tigner A-1 Unit Well and the tendering by the lessee to the lessor of the shut-in royalty payments in accordance with Paragraph 7 of the lease, the Court of Appeal considered the two following paragraphs of the lease:
"7. (a) It is agreed that if a well (or wells) is completed hereunder which is capable of producing gas only, (including gasoline and condensate content) then until such time as such gas (including gasoline and condensate content) is sold or utilized off the premises, *653 or in the event Lessee should at any time or times after gas (including gasoline and condensate content) is produced and sold off the premises from such well or wells, deem it inadvisable to produce and sell gas from such well or wells, and Lessee shall discontinue the production thereof, which right is hereby granted, Lessee shall during such periods pay Lessors at the rate of $200.00 per year, payable quarterly, for each such well on the premises from which gas (including gasoline and condensate content) is not being produced; and so long as such lieu royalty is paid said well or wells shall be considered wells producing gas in paying quantities under Paragraph 2 hereof.
* * * * * *
"(c) The rights granted Lessee herein to discontinue the production of gas, including its gasoline and condensate content, may only be exercised so long as there is a well or wells on the leased premises capable of producing gas, including its gasoline and condensate content, in paying quantities.
* * * * * *
"14. Lessee is hereby granted the power and right, at its option and without Lessors' joinder or further consent, at any time while this lease is in force, either before or after production, to combine and pool the lease, mineral and royalty rights in all the lands covered by this lease or any portion thereof with any other land, lands, lease, leases, mineral and royalty rights or any of them, adjacent, adjoining or located within the immediate vicinity of this lease, whether owned by Lessee or some other person, firm or corporation so as to create by such combination and pooling one or more drilling or production units. It is further agreed that Lessee may limit such pooling and unitization to any one or more producing horizons, and as to any one or more products, and, if limited, may extend the same from time to time as Lessee may deem advisable so as to make any such pooling and unitization apply and extend to any other formation or formations, product or products, in addition to the formation or formations, product or products, originally designated, and Lessee may also declare any unit or units so as to conform to any valid rule or regulations of the Department of Conservation of the State of Louisiana touching upon or regulating that subject. Each such drilling or production unit shall not exceed 640 acres plus a tolerance not to exceed 10% of 640 acres when created for the purpose of drilling for or producing gas, distillate or condensate, or any combination of such products therefrom, and 40 acres, plus a tolerance not to exceed 10% of 40 acres when created for the purpose of drilling for or producing oil therefrom unless the same shall be larger or smaller than the maximum drilling or production unit fixed as a basis for the development or operation of the field by the Conservation Department of the State of Louisiana, or other regulatory body, Federal or State, having jurisdiction in the premises, in which event each such unit created hereunder shall not exceed the maximum so prescribed for and in force in the field at the time such unit is created. Lessee shall execute in writing and record in the Conveyance Records of the parish or parishes in which each unit created hereunder is located an instrument identifying and describing each such unit. As between the parties hereto the entire acreage so pooled into a drilling or production unit or units shall be treated, for all purposes except the payment of royalties and the lieu royalties on the production from the pooled unit or units, as if it were included in this lease. In lieu of the royalties and the lieu royalties elsewhere herein specified, Lessors shall receive, on the production from each unit created hereunder, only such proportion of the royalties stipulated herein as the amount of Lessors' *654 acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved. Drilling or reworking operations on or the production of oil, gas, sulphur or other minerals from any portion of the land covered hereby shall continue this lease in force and effect during or after the primary term as to all the lands covered hereby, subject to the exceptions hereinafter mentioned. If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors' and Lessee's rights in force hereunder as if such operations were on or such production from the land covered hereby, except that this effect shall be limited to the land covered hereby which is included in such pooled unit. This lease, during any period in which it is being so maintained as to any part of the land covered hereby included within any such unit, may be maintained as to the remainder, in any manner elsewhere provided for herein, provided that if it be maintained by rental payment, the rentals shall be reduced to the extent of the number of acres covered by this lease and which are included in such unit or units. The Lessee may place and use on each unit created hereunder common measuring and receiving tanks for the production from such unit.
"It is agreed that as to the separately owned tracts covered by this lease the mineral rights and royalties of the Lessors hereunder are not pooled or unitized merely by virtue of the joint execution of this lease and that such mineral rights and royalties shall be deemed to be pooled or unitized only in the event and to the extent that the same are so pooled or unitized by Lessee's action as above set forth."
After reviewing the case, the Court of Appeal concluded that Paragraph 14 of the lease applied solely and only to units voluntarily created by the lessee in the form and in the manner designated therein. It correctly observed that "No provision is contained therein relating specifically to forced units created by orders of the Commissioner of Conservation. Nor does the lease contemplate that its provisions would be applicable to such forced pooling." [129 So. 2d 534] It further concluded that Paragraph 14 was not misleading and that when consideration was given to all of its provisions, it became evident that the entire paragraph (14) related solely to voluntary units and not forced-pooled units by actions of the Commissioner of Conservation; that the effects of voluntary unitization did not extend to a unit pooled by orders of the Commissioner; that the provisions of the lease relating to voluntary pooling by the lessee contemplated that operations on, or production from, the voluntary unit should only extend to the leased lands included in that unit and should have no effect as to other of the leased premises not included therein.
The Court of Appeal further concluded and held:
"* * * the effect of the forced unitization of a portion of the leased lands, so far as maintaining the lease in force and effect as to the leased lands not included within the forced unit, extended only to May 20, 1957, when the voluntary unit was created and became effective, as, on that date, by the action of the lessee undertaken in accordance with the provisions of paragraph 14, the leased property was divided and segregated and the lease and its obligations divided. Thus, as to plaintiffs' lands covered by defendant's lease, located in Section 32, the preservation of the lease beyond its primary term, expiring with May 26, 1957, depended upon whatever operations were conducted on or production secured from said leased lands or on lands in a unit of which plaintiffs' lands comprised a part before the *655 expiration of the primary term of the lease."
The Court of Appeal found that neither were operations conducted on nor production secured from either the land or lands in Section 32 after the formation of the voluntary unit and prior to the expiration of defendant's lease; it relied on the case of Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416. It still further found that no payment of lieu royalty was made or tendered before the expiration of the primary term of the lease. It denied plaintiffs attorney's fees because they prayed for the cancellation of the entire lease and were only successful in having it cancelled in part; it allocated the costs one-half to the plaintiffs and one-half to the defendant.
Union Producing Company, relator, assigns the following Specification of Errors in the judgment of the Court of Appeal ordering the cancellation of the instant lease as to lands located in Section 32:
"1. The Court of Appeal erred in holding that the decision in Wilcox v. Shell Oil Company, 226 La. 417, 76 So.2d 416 (1954) controls this case on the ground that the terms of the lease in the Wilcox case `are substantially the same' as the terms of the Odom lease.
"2. The Court of Appeal erred in holding that the shut-in Tigner A-1 Well in Section 32 was not equivalent to production from the voluntary unit because it was completed to production prior to the formation of the unit, despite the provision of Paragraph 14 of the lease that lessee could pool `either before or after production.'
"3. The Court of Appeal erred in holding that shut-in royalty had to be paid in advance, when the lease specifically provides that such payments `shall' be made `quarterly,' but does not require payment in advance.

"4. The Court of Appeal erred in holding that by creating the voluntary unit `such action resulted in a division of the lease,' and also erred in stating that defendant `concedes' that the voluntary unitization had this effect.
"5. After holding that there was no production from the voluntary unit, the Court of Appeal erred in not holding that the prior production from the Conservation unit in Section 33 continued the lease in force and effect in its entirety."
Relator also contends:
"The Odom Lease was continued in full force and effect as to all of the land described therein by production from the Conservation Unit in Section 33it was Unnecessary for Relator to form the voluntary unit in order to hold the acreage in Section 32."
At the outset, we find that Paragraph 14, supra, provides for a voluntary unit and not a force pooled unit by the Conservation Commissioner. We agree with the able reasons for such interpretation which the Court of Appeal set forth in its decision; therefore, no further discussion is necessary.
Under the present lease, the forced unitization of Section 33 by the Conservation Commissioner had the effect of maintaining the instant lease in force and effect as to the leased lands not included within the forced unit for a limited time.
Paragraph 14, supra, of the lease granted the parties to the lease the right to pool the lease with adjoining lands. This paragraph also provides that if operations be conducted on or production be secured from land in any pooled unit other than land covered by the lease, it shall have the same effect as to maintaining Lessors' and Lessee's rights in force as if such operations were on or such production from the land covered thereby. An exception follows; it states that "this effect shall be limited to the land covered hereby which is included in such pooled unit."
*656 Our recent jurisprudence, although recognizing the doctrine of LeBlanc v. Danciger Oil & Refining Co., 218 La. 463, 49 So.2d 855, that the lessee's obligation to drill a well is indivisible in its nature and the lessor's corresponding obligation to deliver the land is also indivisible, with the result that if the obligation of one is fulfilled in its entirety, then the obligation of the other is also fulfilled in its entirety, has held that the parties to a mineral contract may by their conventions reduce the acreage covered by such contract. See, Elson v. Mathewes, 224 La. 417, 69 So.2d 734; Childs v. Washington, 229 La. 869, 87 So.2d 111; Jumonville Pipe & Machinery Co. v. Federal Land Bank, 230 La. 41, 87 So.2d 721; Brown v. Mayfield, La.App., 92 So.2d 762; and, Richard v. Sohio Petroleum Company, 234 La. 804, 101 So.2d 676.
By their conventions the parties to the instant lease agreed that when a voluntary unit was formed it would only cover plaintiffs' lands located within the unit. Therefore, on May 20, 1957, when the voluntary unit was filed for registry, the action of the lessee had the effect of reducing or removing from the control of the Conservation Unit plaintiffs' lands located within Section 32.
We do not find that the Specification of Errors, supra, necessitates a detailed discussion of the numerous authorities treating of oil, gas, and mineral leases. The Specification requires an interpretation of the instant leaseparticularly Paragraphs 7 and 14, supraand its application to the facts of record.
The instant lease is the contract between the parties; the mineral lease is merely a contract which permits the lessee to explore for minerals on the land of the lessor in consideration of the payment of a rental and/or bonuses. Perkins v. Long-Bell Petroleum Co., Inc., 227 La. 1044, 81 So.2d 389; Reagan v. Murphy, 235 La. 529, 105 So.2d 210. All of the clauses of the agreement of lease are to be interpreted "the one by the other," giving to each the sense that results from the entire act. See, LSA-C.C. Art. 1955. Contracts must be construed as a whole; the court will, if possible, give effect to all parts of the instrument, and a construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable. United Carbon Co. v. Interstate Natural Gas Co., Inc., 176 La. 929, 147 So. 37. In interpreting an agreement the intention of the parties and the effect given to it must be ascertained. Simmons v. Hanson, 228 La. 440, 82 So.2d 757. In a doubtful case the agreement is interpreted against him who has contracted the obligation. LSA-C.C. Art. 1957; Robbert v. Equitable Life Assur. Soc. of United States, 217 La. 325, 46 So.2d 286. Any doubt as to the meaning of a document must be resolved against the company in whose office it was prepared. Texas Co. v. Crais, La.App., 155 So. 405; Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72, 125 A.L.R. 1075; Lawson v. Martin Timber Company, 238 La. 467, 115 So.2d 821. An order of the Department of Conservation may supersede the contracts made between landowners and lessees. Alston v. Southern Production Co., 207 La. 370, 21 So.2d 383.
Paragraph 7, supra, provides for a shut-in well and states that as long as lieu royalties are paid quarterly, the well shall be considered as producing gas in paying quantities. Section (c), supra, indicates that it was the intention of the drafter that the section should apply to a well on the leased premises. No mention is made in the paragraph as to pooling or unitization; no statement is made as to the effect of such a well when it is located off of the leased premises.
In Delatte v. Woods, 232 La. 341, 94 So. 2d 281, 287 we held that, "The completion and the existence of a shut-in gas well on a validly created unit are equivalent to production on all tracts in order to interrupt the prescription accruing against royalty interest and preserve same from extinction *657 by prescription," but, in that case we were considering a well on a unit force pooled by the Department of Conservation.
Paragraph 14, supra, states that the lessee may, without the lessor's joinder or further consent, at any time while the lease is in force, either before or after production, combine and pool the lease with the land covered by the lease or any other land, but no mention is madewhich we have held applies only to a voluntary unitof a "shut-in" well or the location of such a well off of the leased premises.
In interpreting a contract the relation of the parties may be considered, their connection with the subject matter of the contract and the circumstances under which it was made in determining the intention from the entire agreement. Simmons v. Hanson, 228 La. 440, 82 So.2d 757. Here, plaintiffs and defendant are diverse in their interpretation of the lease. If the lease were to be interpreted as proposed by the lessee, it would have the privilege of completing a shut-in well on property other than the lessor's not paying lieu royalties for approximately three months, and unitizing the lessee's property jointly with the property containing the shut-in well indefinitely. Plaintiffs contend that the Tigner A-1 Well which was drilled to completion and shut-in before the formation of the voluntary unit under lease provisions was not a well completed under the Odom Lease.
We find that the instant lease must be interpreted against lessee, who drafted it, and that in order to read Paragraphs 7 and 14 together we must conclude that, in order to continue the instant lease under the circumstances of the case beyond its primary term by the completion of a shut-in well on the voluntary unit, operations had to be conducted on the land of the lessors, namely, the ninety-eight (98) acres in Section 32, which were included in the Voluntary Tigner "A" Unit.
Because of our conclusion, supra, we do not find it necessary to pass on whether or not the case of Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416, is apposite. Respondent has made no complaint as to the assessment of costs by the Court of Appeal; we find that its assessment is correct.
For the reasons assigned, the judgment of the Court of Appeal, Second Circuit, is affirmed.
HAMITER, J., concurs in the result.
HAWTHORNE and SANDERS, JJ., concur in the decree.
McCALEB, J., dissents with written reasons.
SUMMERS, J., dissents and assigns reasons.
McCALEB, Justice (dissenting).
The gravamen of the result reached by the majority here, and by the Court of Appeal below, appears to be that nothing occurred during the primary term of the lease to prevent the lease from expiring. I do not agree.
Albeit, at the time the leased area in question was included in the voluntary unit, the well was shut-in and there was no production in fact, the lease provided for constructive production through shut-in royalties. I do not believe that the fact that shut-in royalty payments were not tendered until after the primary term expired is determinative with regard to the issue of constructive production. By the terms of the lease, shut-in royalties were not such as were payable at the option of the lessee in order to keep the lease alive beyond the primary term but, rather, were absolute obligations which began to accrue once the leased area was included within a unit containing a shut-in well. The royalties were owed, although not due, at the time the primary term of the lease expired. Payment *658 was tendered before the due date and no ground for cancellation of the lease arose from non-payment of these royalties. The fact that the lessor acquired a valid right to shut-in royalties during the primary term is sufficient, in my opinion, to constitute constructive production and to extend the life of the lease.
Further, I cannot agree with the construction given to Paragraph 7, Section (c) of the lease by the majority, which would limit the effect of shut-in royalties to situations where the shut-in well is physically located on the leased land. This resolution would apparently justify the cancellation of leases on land voluntarily pooled with other land on which the well is situated unless such well is always in production and even though it is shut-in for lack of a market or otherwise. But such conclusion is not sound; the lease must be read as a whole and Paragraph 14 fully clarifies any ambiguity that might be present in Paragraph 7, Section (c) thereof. Paragraph 14 states, in part:
"As between the parties hereto the entire acreage so pooled into a drilling or production unit or units shall be treated, for all purposes except the payment of royalties and the lieu royalties on the production from the pooled unit or units; as if it were included in this lease. In lieu of the royalties and the lieu royalties elsewhere herein specified, Lessors shall receive, on the production from each unit created hereunder, only such proportion of the royalties stipulated herein as the amount of Lessors' acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved." (Emphasis supplied).
The result reached by the majority renders this part of Paragraph 14 of no effect. Also, the realities of the situation make it immaterial whether the well is located on the lessor's land or in some other part of the pooled unit, for the lessor's right to revenue will be the same in either case. See Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734.
I believe that the inclusion of the leased area within a unit which contained a well, capable of profitable production, and the consequent accrual of a right to shut-in royalty payments on behalf of the lessor during the primary term of the lease had the effect, under the clear provisions of the lease, of keeping the lease alive beyond the primary term.
I respectfully dissent.
SUMMERS, Justice (dissenting).
I am in accord with the majority view in its holding that after the formation of the unit by the Commissioner of Conservation affecting, among other lands, forty acres of the leased premises in Section 33, the leased lands outside that unit were held by production from that unit. I further agree that thereafter the formation of the voluntary unit in Section 32 authorized by the agreement between the parties resulted in a division of the lease obligationsnot by operation of law, but by the express conventions of the parties. This concurrence is based upon the authorities cited by the author of the majority opinion supporting each of these propositions. It is apparent, too, as recognized by the majority, that what remains for decision primarily involves the interpretation of this lease contract which is the law of the case between the parties. Further than this, however, I cannot agree. I do not agree that the terms and conditions of the lease deny the lessee the right to voluntarily pool or unitize that portion of the leased premises lying outside the unit formed by the Commissioner of Conservation with a shut-in well previously drilled and located on lands other than the leased premises. It is my opinion that such a unit is authorized by the lease and should be considered to be producing if shut-in royalties are timely tendered.
The majority opinion holds that under the terms of the lease a well in a voluntary *659 unit cannot be shut in and have the effect of maintaining lessee's rights in force on the leased acreage within that unit unless the well is located on the lands described in the lease. To support its views the majority relies on Paragraph 7, Section (c) of the lease relating to shut-in gas wells and lieu royalty which grants the lessee the right to "discontinue the production of gas" under the condition that this right may be exercised "so long as there is a well or wells on the leased premises capable of producing gas * * *." To properly understand the meaning of "leased premises" resort must be had to Paragraph 14 of the lease. There we find this language: "As between the parties hereto the entire acreage so pooled into a drilling or production unit or units shall be treated * * * as if it were included in this lease." Further, that paragraph, in defining what is to constitute production from a voluntary unit, reads: "If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors' and Lessee's rights in force hereunder as if such operations were on or such production from the land covered hereby, * * *." (Italics mine.)
Read together the language of these paragraphs, in my opinion, permits a shut-in well in a voluntary unit on lands other than those described in the lease to have the effect of maintaining lessee's right under the lease insofar as the leased lands in that unit are concerned.
Lessors' expressed reason for contending that the well must be completed on the leased premises is stated in their brief as follows: "Such a requirement would force the lessee to either drill on the land leased or on a unit including some of the leasehold which was formed before the completion of the well and thus, it would prevent lessee from attaching the leased lands to some shut-in gas well and thereby perpetuating the lease at a nominal rental. This latter practice is one that has arisen in recent years where, because of tax consequences or otherwise, large oil and gas companies have sought to tie up as much land as possible by shut-in gas wells."
This argument discloses that lessors do not now find the agreement entered into by them compatible with their present wishes or best interest under the circumstances. They are in effect saying that the "either before or after production" clause of the pooling agreement has no meaning, for they now take the position that the unit must be formed "before the completion of the well". Moreover, having agreed upon the amount of the lieu royalty payments (which they refer to above as nominal rental) they cannot now be heard to say that the lieu royalty payments are not adequate and that the quoted provisions of Paragraph 7, Section (a) providing for the payment of lieu royalty in the amount of "$200 per year, payable quarterly" have no meaning. Such an interpretation is an effort to repudiate the lessors' contractual obligations and deprive lessee of the fruits of their contract maintained by rental payments over a period of almost ten years at the very moment when their investment and effort promise to bear fruition.
Furthermore, "attaching the lease", i. e., unitizing the leased lands with other land, lessors argue, has the effect of perpetuating the lease at "some" nominal rental. The answer to the argument that the rental (lieu royalty) is nominal is that lessors should not have agreed thereto if they did not consider that rental adequate. The answer to the objection that the lease is perpetuated by attaching the leased premises by way of unitization to other lands on which a well has been drilled is that this argument fails to recognize that "attaching the lease" (unitization) permits the lessors primarily to share in future production from the well to which the lease is attached as a result of the voluntary unitization, subject to the conditionas agreed uponthat it may be shut in pending production. The shutting in of the well does *660 not permit the perpetuation of the lease indefinitely but upholds the lease only for the time during which lieu royalty payments may maintain the lease according to its terms which are as follows:
"The lessee may, from time to time, discontinue the production of gas, including its gasoline and condensate content, under the foregoing provisions of this section, provided, however, that the aggregate sum of the periods of such continuance shall not exceed ten (10) years." Paragraph 7, Section (b).
It is unimportant in unitization whether a well is on the leased premises or other lands for the share the lessors enjoy in the unit production is not determined by the location of the well within the unit, but the lessors' participation is determined by the proportion which the leased lands bear to the total unitized acreage. It can be pointed out that under these circumstances a lessor whose lands are not the situs of the drilling operations is relieved of the nuisance associated therewith and nevertheless enjoys the fruit of those operations; that not having one's lands drilled upon, therefore, is an advantage a lessor in a producing unit enjoys over other lessors in that unit whose lands are occupied with drilling operations. I fail, therefore, to recognize the validity of the lessors' argument. Even if the result were an advantage to the lessee it should not for that reason be reprobated for it is an advantage contracted for, flowing from the agreement of the parties and should be upheld by this court.
My interpretation of the foregoing would result in the conclusion that the unit formed after the well was drilled and shut in was authorized to be formed by that portion of Paragraph 14 which permits the formation of a voluntary unit "either before or after production"; that the well in that unit maintained the lease in effect insofar as the leased lands in the unit are concerned, provided lieu royalties were properly and timely tendered.
It would then become necessary to decide whether the lieu royalty tendered after the primary term but within the "quarterly" period provided for its payment is a compliance with the lease. I would resolve that proposition by saying that the shut-in well was in effect constructive production until the lieu royalty became past due and delinquent, that is, in this case, upon the expiration of the quarterly period computed from the date the voluntary unit was formed and the shut-in well consequently included in that unit.
To hold otherwise would be to say that the shutting in of a well results in forfeiture of the lease unless the lieu royalty is simultaneously paid. Such an interpretation would give no effect to the language of the lease which provides that lieu royalty is "payable quarterly". Inasmuch as the lease did not provide that the lieu royalty payment was to be made in advance or at any other specified time within the quarter, such as the beginning or end of the quarter, the payment was properly made at any time during that quarterly period. Article 2057 LSA-Civ.Code; 52 C.J.S. Landlord and Tenant § 511; 32 Am.Jur., Landlord and Tenant, 462; 126 A.L.R. 565.
By its interpretation of the lease the majority opinion decrees what I consider to be a harsh result. The lessee, by forming the voluntary unit in order to permit the lessor to share in a well he was not previously entitled to share in, thereby placed himself in a more onerous position than that which he occupied prior to the formation of the voluntary unit. This is true, inasmuch as the land affected by the voluntary unit would otherwise have been held by virtue of the production from the unit formed by the Commissioner of Conservation; this latter unit having within its bounds forty acres of the leased premises.
By its decision the majority holds that this voluntary unitization by the lessee in order to further develop the premises of *661 the lessor outside the unit formed by the Conservation Commission, although he was not at this time obligated to form a voluntary unit, brings about a forfeiture of the lease, simply because the well in the unit was not on the leased premises. To bring about such a result the language of the lease should be express, clear and unambiguous.
I respectfully dissent.

ON REHEARING
SANDERS, Justice.
We granted a rehearing in this case to reconsider our holding which cancelled the oil, gas and mineral lease held by Union Producing Company on a 98 acre tract of land owned by plaintiff[1] in Claiborne Parish.
A detailed statement of the facts was made in the original opinion of the Court. We need restate only the salient points here.
Executed March 10, 1947, the lease covered approximately 138 acres of land in Claiborne Parish. A 40 acre tract was located in Section 33, Township 23 North, Range 6 West. A contiguous 98 acre tract was located in Section 32 of the same township and range.
The lease stipulated a primary term of ten years from May 26, 1947. It also contained the usual provision that the lease would continue in effect as long thereafter as minerals were produced from the land by the lessee or the obligations in lieu of production were fulfilled.
Effective January 1, 1957, the State Commissioner of Conservation established a drilling unit composed of the South half of Section 33, which embraced the 40 acre tract under the Odom lease. On May 6, 1957, gas production was secured from a well located in this unit on land other than that of the plaintiff. The well was then shut in because of the lack of pipeline connections. On July 27, 1957, it was placed in production.
On May 1, 1957, the lessee completed as a producer of gas a well known as Tigner A-1, in Section 32 on land adjoining the 98 acre tract under the contested lease. Because of the lack of pipeline connections, the well was shut in. On May 20, 1957 (within the primary term of the lease), the Union Producing Company filed a declaration of unitization pooling the 98 acre tract into a 230 acre unit with the Tigner A-1 well.
On June 11, 1957, the Union Producing Company mailed its check for the first quarterly shut-in royalty payment to the plaintiff-lessor. The plaintiff retained the check, but did not cash it.
On July 29, 1957, plaintiff-lessor instituted this suit seeking the cancellation of the lease on the entire 138 acre tract.
The plaintiff concedes that the lease has been preserved on the 40 acre tract in Section 33 located in the Conservation unit by the shut-in well in that unit under the ruling of this Court in Delatte v. Woods, 232 La. 341, 94 So.2d 281. The legal dispute is thus narrowed to the 98 acre tract under lease in Section 32, which is embraced in the Tigner A voluntary unit.
The plaintiff contends that the lease has expired because of the lapse of its primary term without production on the lease tract or within the Tigner A unit. The Tigner A-1 well, it is contended, is not equivalent to production within the primary term of the lease because it was shut in prior to the formation of the voluntary unit, and no lieu royalty was paid prior to the expiration of the primary term. Plaintiff further contends that the well in the Conservation unit did not maintain the lease *662 in effect as to this tract because the formation of the voluntary unit divided the lease obligations.
The Union Producing Company contends that the lease was preserved by the shut-in well in the voluntary unit and the timely payment of shut-in royalty. Alternatively, it contends that if the shut-in well in the voluntary unit did not preserve the lease, then the lease was not divided and is maintained by production from the Conservation unit.
These contentions are based upon the provisions of the lease. Their resolution is not free from difficulty.
The lease contract is the law between the parties. It defines their legal rights and obligations. It must be construed as a whole, and so far as possible, effect must be given to all of its provisions.[2] If an ambiguity is found, it must be construed against the lessee-defendant who prepared the contract.[3]
Analysis of the lease reveals that the effect of the shut-in well in the voluntary unit is anchored in Paragraphs 7 and 14.
Paragraph 14 provides in part:
"Lessee is hereby granted the power and right, at its option and without Lessors' joinder or further consent, at any time while this lease is in force, either before or after production, to combine and pool the lease, mineral and royalty rights in all the lands covered by this lease or any portion thereof with any other land, lands, lease, leases, mineral and royalty rights or any of them, adjacent, adjoining or located within the immediate vicinity of this lease, whether owned by Lessee or some other person, firm or corporation so as to create by such combination and pooling one or more drilling or production units * * *. As between the parties hereto the entire acreage so pooled into a drilling or production unit or units shall be treated, for all purposes except the payment of royalties and the lieu royalties on the production from the pooled unit or units, as if it were included in this lease. In lieu of the royalties and the lieu royalties elsewhere herein specified, Lessors shall receive, on the production from each unit created hereunder, only such proportion of the royalties stipulated herein as the amount of Lessors' acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved * * *. If such operations be conducted on or production be secured from land in any pooled unit other than land covered by this lease, it shall have the same effect as to maintaining Lessors' and Lessee's rights in force hereunder as if such operations were on or such production from the land covered hereby, except that this effect shall be limited to the land covered hereby which is included in such pooled unit." (Italics ours)
The pertinent portion of Paragraph 7 provides:
"(a) It is agreed that if a well (or wells) is completed hereunder which is capable of producing gas only, (including gasoline and condensate content) then until such time as such gas (including gasoline and condensate content) is sold or utilized off the premises, or in the event Lessee should at any time or times after gas (including gasoline and condensate content) is produced *663 and sold off the premises from such well or wells, deem it inadvisable to produce and sell gas from such well or wells, and Lessee shall discontinue the production thereof, which right is hereby granted, Lessee shall during such periods pay Lessors at the rate of $200.00 per year, payable quarterly, for each such well on the premises from which gas (including gasoline and condensate content) is not being produced; and so long as such lieu royalty is paid said well or wells shall be considered wells producing gas in paying quantities under Paragraph 2 hereof.

"(b) The Lessee may, from time to time, discontinue the production of gas, including its gasoline and condensate content, under the foregoing provisions of this section, provided, however, that the aggregate sum of the periods of such discontinuance shall not exceed ten (10) years.
"(c) The rights granted Lessee herein to discontinue the production of gas, including its gasoline and condensate content, may only be exercised so long as there is a well or wells on the leased premises capable of producing gas, including its gasoline and condensate content, in paying quantities." (Italics ours)
The provisions in Paragraph 14 authorized the lessee to pool the lands covered by the lease either before or after production. On May 20, 1957, the lessee pooled the 98 acre tract with adjoining land in Section 32 on which was located the Tigner A-1 shut-in gas well. It is clear, therefore, that the Union Producing Company created a valid production unit within the primary term of the lease.
Paragraph 7 of the lease granted to the Union Producing Company the right to defer the sale of gas or discontinue production of gas from a gas well "completed hereunder" so long as there was a well "on the leased premises" capable of producing gas in paying quantities.
Plaintiff strenuously urges that Paragraph 7 is inapplicable because the Tigner A-1 well was not on the leased premises and was completed prior to the formation of the unit. Standing alone the provisions of Paragraph 7 appear to support this view. However, this paragraph cannot be isolated without doing violence to the lease. It must be construed in connection with Paragraph 14 which provides that the entire acreage so pooled shall be treated "as if it were included in the lease" and that production from other portions of the unit shall have the same effect in maintaining lessee's rights as if the production was "from the land covered hereby." Contrary to the contentions of plaintiff, the exception in Paragraph 14 of "the payment of royalties and lieu royalties" has reference only to the amount of the royalties due the lessor after pooling. The additional language pertinent to the exception reads:
"* * * In lieu of the royalties and the lieu royalties elsewhere herein specified, Lessors shall receive, on the production from each unit created hereunder, only such proportion of the royalties stipulated herein as the amount of Lessors' acreage (mineral or royalty rights) placed in the unit bears to the total acreage included in the particular unit involved."
The exception means only that the lieu royalty of $200.00 per year fixed in Paragraph 7 shall be prorated in conformity to unit ownership. The obligation to pay lieu royalty is not otherwise affected.
When the lease is thus construed, the shut-in well has the same effect as if it were physically located on plaintiff's land. The convention of the parties has made it equivalent to a well "completed hereunder" and "on the leased premises" as provided in Paragraph 7. The amount of the royalty is reduced to that proportion of it which plaintiff's acreage bears to the total acreage *664 in the unit. In this respect, the plaintiff's right to revenue is no different from that which it would have been if the well had been physically located on his land. See Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734. The shut-in well with the consequent accrual of lieu royalty was equivalent to production from all tracts within the unit. See LeBlanc v. Haynesville Mercantile Company, 230 La. 299, 88 So.2d 377. This preserved the lease beyond its primary term provided, of course, that the Union Producing Company did not default in the payment of the royalty. In Davis v. Laster, 242 La. 735, 138 So.2d 558, with Justice Summers as organ of the Court, we stated:
"The shut-in clause is specifically designed to enable the lessees to protect their investment in a shut-in well beyond the primary termfor, at the expiration of the primary term, they can no longer pay delay rentals to maintain the lease and they cannot produce the gas from the well they have discovered where no market is available. Therefore, if it were not for the shut-in clause, and the constructive production resulting from its application, the lease would be forfeited for expiration of its term at the end of the primary term."
The well was shut in on May 1, 1957, and the unit was formed on May 20, 1957. The tender of lieu royalty was made on June 11, 1957. The payment was made to satisfy the obligation imposed on the lessee by Paragraphs 7 and 14 of the lease.
As to the time of payment of the lieu royalty, the lease provides only that it is to be "payable quarterly." It contains no express provision for payment in advance or at any other specific time within the quarter. Hence, payment at any time within the quarterly period was proper.[4] The payment on June 11, 1957, was timely.
To support the cancellation of the present lease, plaintiff relies upon the decision of this Court in Wilcox v. Shell Oil Co., 226 La. 417, 76 So.2d 416. The lease in that case provided:
"The commencement of a well or the completion of a well to production, and the production of oil or gas therefrom, on any portion of an operating unit in which all or any part of the land described herein is embraced shall have the same effect, under the terms of this lease, as if a well were commenced or completed on the land embraced by this lease." (Italics ours)
Based on that specific provision, we held that a well completed and shut in before formation of the unit did not maintain the lease beyond its primary term. The Court stated:
"This well therefore was (1) not commenced on this unit, (2) not completed to production on this unit, and (3) production was not from a well completed to production on this unit, because each of these operations took place prior to the existence or establishment of the operating unit. * * * Thus, although there was a producing well on the unit on the rental date, that well was completed to production before the unit was formed, and production from it is not considered as production from the Wilcox lease."
Unlike the lease in that case, the present lease authorizes pooling after production and does not require the production to be from a well completed to production on the unit. Because of the variant lease provisions, we find the case inapplicable.
We conclude that the shut-in well in the voluntary unit with the accrual of obligatory lieu royalty constituted constructive production and preserved the lease beyond its primary term.
*665 Because of this conclusion, we do not reach the alternative contention that the lease was maintained beyond its primary term on the 98 acre tract by the well in the Conservation unit. It thus becomes unnecessary for the Court to decide whether or not the formation of the voluntary unit divided the lease obligations.
For the reasons assigned, the judgment of the Court of Appeal is reversed, and the plaintiff's suit is dismissed.
It is further ordered, adjudged, and decreed that the plaintiff pay one-half of the court costs and that the defendants pay one-half thereof.
HAMITER, J., dissents, being of the opinion that our original decree should be reinstated and made final.
HAMLIN, J., dissents with written reasons.
HAMLIN, Justice (dissenting).
I respectfully dissent from the majority opinion for the reasons set forth in the original opinion of this Court, of which I was the author, and for the following additional reasons:
This suit involves the interpretation of the provisions of an ambiguous lease executed on a printed form especially prepared by Union Producing Company for its exclusive use in the area involved herein.
As I understand the majority opinion, it construes two conflicting provisions in this printed lease, especially prepared by Union Producing Company, in favor of said Company. This holding, in my opinion, is contrary to the rule set forth in the jurisprudence cited in the original opinion.
There is no rule without a reason. It is my view that one of the reasons for the rule is the protection of the rights of individuals who do not have the resources to participate in extended litigation, with the expense, annoyance and inconvenience incident thereto, and who many times are compelled to accede to an interpretation of a printed contract drafted by those with whom they negotiate, rather than take part in such prolonged expensive, annoying and inconvenient litigation, which they can ill afford.
For these reasons, and for the reasons assigned in the original opinion, I respectfully dissent.
NOTES
[1] "SE¼ of SE¼ and SW¼ of SE¼ except 10 acres off the west end of said last named quarter, S½ of NE¼ of SE¼ and a tract of land containing eight (8) acres described as commencing at the northwest corner of the SE¼ of SE¼ of Section 32, thence run west 170 yards, thence north 220 yards, thence east 170 yards, thence south 220 yards to the starting point, all in Section 32, and the SW¼ of SW¼ of Section 33, all in Township 23 North, Range 6 West, Claiborne Parish Louisiana."
[2] Stipulation of Facts, Paragraphs 8 and 9.
[3] Stipulation of Facts, Paragraphs 10 and 11.
[4] Check was not cashed.
[1] The original plaintiff, J. Holbert Odom, died after the institution of this action, and his heirs were substituted as parties plaintiff. For convenience we refer to the substituted plaintiffs in the singular throughout this opinion.
[2] Delatte v. Woods, 232 La. 341, 94 So.2d 281; United Carbon Co. v. Interstate Natural Gas Co., 176 La. 929, 147 So. 37. See also Knight v. Blackwell Oil & Gas Co., 197 La. 237, 1 So.2d 89; Glassell v. Richardson Oil Co., 150 La. 999, 91 So. 431; Pothier v. Barber Laboratories, 227 La. 357, 79 So.2d 481.
[3] Lawson v. Martin Timber Company, 238 La. 467, 115 So.2d 821; Muse v. Metropolitan Life Ins. Co., 193 La. 605, 192 So. 72, 125 A.L.R. 1075.
[4] See LSA-C.C. art. 2057; Risinger v. Arkansas-Louisiana Gas Co., 198 La. 101, 3 So.2d 289; 52 C.J.S. Landlord and Tenant § 511, p. 315; 32 Am.Jur., Landlord and Tenant, § 462, p. 378; 126 A.L.R. 565.